[Crim. No. 21979. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID BALDERAS, Defendant and Appellant.

158

**COUNSEL**

Allan B. O'Connor, under appointment by the Supreme Court, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, Eddie T. Keller and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRODIN, J.**—In a single proceeding, defendant David Balderas was tried on sixteen felony counts set forth in two informations and arising from three separate incidents. The principal information, No. 21050, first charged defendant with crimes against Randy L. and Corrine S. in the early morning of December 24, 1979. The jury convicted defendant, as charged, of two counts each of forcible kidnapping (Pen. Code, § 207[1]) and robbery (§ 211), and one count each of forcible rape (§ 261, former subd. (3)), oral

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

copulation (§ 288a, subd. (c)), and sodomy (§ 286, subd. (c)). As to each count, the jury found that defendant had used a firearm (a sawed-off shotgun). (§ 12022.5.)

Information No. 21050 also charged offenses committed against Neil Wanner later in the morning of December 24, 1979. In the Wanner incident, defendant was convicted of kidnapping for purposes of robbery (§ 209), robbery (§ 211), and first degree murder (§ 187). The verdict specified that defendant intentionally inflicted great bodily injury during the kidnapping and robbery of Wanner. (§ 12022.7.)[2] A charge that defendant possessed a sawed-off shotgun on December 24, 1979 (§ 12020, subd. (a)) was also upheld. Under the 1978 death penalty law, the jury found true a charged special circumstance that defendant committed the Wanner murder while engaged in the commission or attempted commission of a robbery. (§ 190.2, subd. (a)(17)(i).)

A second information, No. 21762, charged defendant with an escape from custody on August 20, 1980. (§ 4532, subd. (b).) Included were two counts each of assault with a deadly weapon on a police officer (i.e., two jail guards) (§ 245, subd. (b)) and false imprisonment (of the guards) (§§ 236, 237). Defendant was convicted on all counts.

The jury assessed the death penalty for the murder. The trial court denied defendant's motion for a new trial and affirmed the death sentence. (§ 190.4, subd. (e).) It also imposed a total sentence of 20⅓ years on the noncapital offenses, including a conviction in a separate trial (action No. 20849) for an auto theft committed on January 10, 1980. (Veh. Code, § 10851.)[3] The trial in action No. 20849 had also served as a probation revocation hearing in action No. 19490, a 1978 auto-theft conviction, and defendant's probation had been revoked. Sentencing in action No. 19490 was consolidated with the instant proceeding. The court imposed the upper term of three years for the 1978 offense, the sentence to run concurrently with those for the other counts. Defendant received 592 days of custody,

---

[2] Allegations that defendant used a firearm in the commission of the Wanner crimes were apparently withdrawn before trial.

[3] Defendant received the upper term of eight years for the principal noncapital offense, rape (§ 264), plus a two-year "firearm" enhancement. To this base term were added consecutive subordinate terms totalling the maximum permissible five years for other charged felonies not listed as "violent" under section 667.5, subdivision (c), including the kidnappings and robberies of Randy L. and Corrine S., the shotgun possession, the escape, the deadly weapon assaults on the jail guards, and the 1980 auto theft conviction. An additional two consecutive years each were assessed for the "violent" felonies of oral copulation and sodomy on Corrine S., plus two-thirds of a year each for firearm use. (§ 1170.1, subd. (a).) The court stayed sentence on the kidnapping and robbery of Neil Wanner, and the false imprisonment of the jail guards, pursuant to section 654.

work, and good-time credit. (§§ 2900.5, 4019.) The court ordered that if the death sentence was overturned or not carried out for any reason, any sentence ultimately imposed for the Wanner murder should be served consecutively to all others. This appeal is automatic.

We reject all defendant's challenges to his convictions for the crimes charged. However, we reverse the sole "special circumstance" determination—that the murder was committed while defendant was engaged in a robbery (§ 190.2, subd. (a)(17)(i))—because the jury was not instructed that this special circumstance requires a finding of specific intent to kill. (*People v. Garcia* (1984) 36 Cal.3d 539, 550, 555-556 [205 Cal.Rptr. 265, 684 P.2d 826], cert. den. (1985) 469 U.S. 1229 [84 L.Ed.2d 366, 105 S.Ct. 1229]; *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 152-154 [197 Cal.Rptr. 79, 672 P.2d 862].) This, in turn, requires that the judgment of death be overturned. (E.g., *People v. Turner* (1984) 37 Cal.3d 302, 329-330 [208 Cal.Rptr. 196, 690 P.2d 669], *People v. Whitt* (1984) 36 Cal.3d 724, 748 [205 Cal.Rptr. 810, 685 P.2d 1161].) For guidance on any penalty retrial, we briefly discuss certain penalty-phase issues which are likely to recur and have not yet been decided.

## I. GUILT TRIAL

### A. Prosecution case.

Under a grant of immunity, Joseph Hix, a friend of defendant, testified that he and defendant attended a party in Bakersfield on the evening of December 23-24, 1979. The two had been drinking premixed Harvey Wallbanger cocktails and snorting "crank" all during the preceding day.[4] While defendant had used PCP in the past, Hix believed he had discontinued its use in recent weeks, and he did not see defendant use PCP on the day or evening of December 23.

About midnight, defendant asked to borrow Hix's car to leave the party; defendant seemed drunk. Hix next saw defendant around 8:30 or 9 the next morning, December 24, at Hix's house. Defendant looked and acted sober. He said that, after leaving the party, he had run Hix's car into a ditch on a rural road near Lamont, where both lived, and had abandoned it. While walking home, defendant said, he had come upon a black couple in a parked car, kidnapped them at the point of a shotgun, raped the woman, forced her

---

[4]"Crank" is a street term for methamphetamine, a powerful stimulant. The parties' respective narcotics experts differed on the actual composition of "crank" generally available on the street. The prosecution's expert suggested that the usual street "crank" is composed mostly of milder stimulants such as caffeine; the defense expert opined that the "crank" available in Kern County was real methamphetamine.

to engage in oral copulation, and left both victims in separate places with their clothing cut off.

Randy L. and Corrine S. testified that, sometime after midnight on December 24, 1979, they were parked in front of her mother's Lamont home in Randy's car, a 1965 white Chevrolet Impala. A man both positively identified as defendant approached the driver's side from between two buildings across the street, holding a shotgun at his side. He tapped on the car window and asked if the couple knew a woman named "Black" or "Blackum" from whom he was supposed to purchase narcotics. When both replied "no," he stuck the gun in the window. Holding the weapon at Randy's head, he got into the car and ordered Randy to drive as directed.

During an erratic journey into rural fields, defendant divested Randy and Corrine of their leather coats and jewelry, including Corrine's rings and earrings and the watches the two had exchanged as Christmas presents. He then ordered Corrine to remove her clothes and throw her undergarments out the window; she complied. He told her to get in the back seat with him, where he forced her to engage in oral copulation and raped her. During this time, he continued to train the shotgun on Randy, who was still driving.

After the car stopped at an isolated dead end, defendant made Corrine get in back with him again, where new acts of oral copulation and rape occurred. The routine was repeated several more times during a wandering trip back toward Lamont—"over four" in all.

A dust storm was blowing outside and, at one point, defendant told Randy to pull over until visibility improved. Later, defendant smashed the rearview mirror with the shotgun when he noticed Randy using it to get a look at him.

Finally, defendant ordered Randy to stop and take off his clothes, which Randy did. Defendant held a knife at Randy's throat and asked if he could feel how sharp it was. Then he cut off the skirt portion of Corrine's dress and the legs and pockets of Randy's pants.[5]

Soon Randy was told to stop again. Defendant ordered him out of the car, gave him back his cut-off pants, and directed him to lie down in the roadway. The weather was windy and cold, and Randy was naked except for the pants and his socks. Before leaving, defendant told Randy, "I hope you freeze, nigger."

---

[5]Randy testified that during this episode defendant threatened to force Randy to copulate him orally but never carried out the threat. Corrine did not remember any such comment by defendant.

Defendant placed Corrine in the driver's seat and told her to continue driving, but she said she was too upset. Defendant drove away himself, sitting on the center console, steering with one hand and brandishing the shotgun with the other. He stopped in another isolated area, again forced Corrine to engage in oral copulation, and sodomized her. During this time, he asked about her children and then said, "Do you think I give a fuck about your damn kids?" He also declared he should kill her so she could not identify him.

Finally, defendant ordered Corrine out, threw her the cut-off dress, and left in the car. Corrine made her way through fields to a house trailer whose residents helped her call the police. Vaginal swabs taken the next day disclosed the presence of sperm.

On cross-examination, Randy disclosed that defendant gave off an odor Randy associated with PCP, but Corrine did not notice any smell. Both said that defendant seemed excited and his driving instructions were erratic, but his speech was clear and his coordination normal.

When defendant showed up at Hix's house later that morning, Hix testified, the two set out in defendant's brother's pickup to find Hix's car. They went past defendant's house; parked in front was a white 1965 Chevrolet Impala which defendant said he had taken from the black couple. Hix and defendant drove around the Bakersfield area for several hours; each took some "crank" during this time. The "crank" only made Hix feel more alert and wide-awake, and he noticed no different effect on defendant.

The truck ran low on gas, and the two stopped at the home of a friend of Hix's to borrow a small amount of gas money. When fuel was needed a second time, Hix and defendant drove to Kern County Medical Center, hoping to steal some money from parked cars. In the parking lot, they saw a man sitting in a pickup truck. Defendant announced he was going to rob the man.

Hix said he wanted no part of a robbery and told defendant he would be at the home of Rachel Jaurez, where the previous night's party had taken place. Defendant then took the sawed-off shotgun, which he had brought along, walked over to the occupied truck, and got in.

Steve Wanner testified that his father, Neil, had dropped him at the medical center about 10 a.m., intending to wait in the Wanners' pickup while Steve's broken ankle was examined. When Steve emerged, Neil and the Wanner pickup had disappeared, and Steve never saw his father alive again.

Hix drove the Balderas truck to the Jaurez house. One or two hours later, defendant arrived in the pickup he had commandeered. Hix, driving the Balderas truck, followed defendant to an alley near a Bakersfield church, where defendant left the other vehicle. The two returned to Lamont in the Balderas truck.

Defendant told Hix that, when he and his victim got to the isolated robbery scene, a struggle ensued. Defendant knocked the victim down, and when defendant's back was turned, the victim hit him with some object from the truck. Defendant then shot the victim in the leg. When defendant started to leave in the commandeered truck, the victim begged not to be left behind to bleed to death. Defendant left anyway. On cross-examination, Hix disclosed that defendant repeatedly said he did not mean to shoot the victim.

Hix and defendant returned to defendant's house after dropping off the pickup borrowed from his brother. There, defendant went through a wallet he said he had taken from the victim. The wallet contained identification for Neil Wanner. Defendant and Hix then burned the wallet and its contents in the back yard.

Neil Wanner's nude body was discovered on a little-used dirt road on the morning of December 25, 1979. There was a hammer between his legs and another tool within five feet of his upraised arms. A bloody rag covered a shotgun wound on the left leg and pelvis. Wanner had bled to death.

Bakersfield and Kern County police executed a search warrant for defendant's residence on or about March 10, 1980. Corrine S.'s watch and Neil Wanner's partially burned wallet were recovered. Defendant's father was wearing a ring belonging to Corrine; he said he had found it in the driveway of the residence during a Christmas visit. Randy L.'s car was ultimately found in a field near Lamont.

Cletus Henson, another acquaintance of defendant, corroborated Hix's version of defendant's account of the night and morning of December 23-24, 1979. According to Henson, defendant came to Henson's house one morning around Christmas and said he had shot somebody. Henson drove defendant to Bakersfield so he could check on a car he had left there. Henson glimpsed a pickup matching the Wanner truck's description abandoned in an alley where the Wanner vehicle was later found by police. Defendant said he had robbed the truck's owner and was going to leave him, but when he turned to get into the truck, the victim hit him in the back with something from the truckbed; defendant showed Henson a red welt on his back. Defendant had responded to the blow, he said, by shooting the victim. The

victim had pled for medical aid, but defendant told him to "go to hell" and left. Henson "knew" defendant had used a shotgun, since he usually carried one.

Henson also testified to defendant's account of the incident with the black couple the night before. Defendant told Henson he had gotten drunk at a party and "high-centered" Hix's car. He commandeered the black couple's auto to avoid walking home, but then decided to "have sex with [the] girl." He "made love" to her several times in the back seat while holding the shotgun to the man's head.

Henson saw the 1965 white Chevrolet defendant said he had taken from the black couple; Henson, Hix, and defendant moved it around several times. Hix had testified that Henson participated in stripping the vehicle; Henson conceded this was his intent, but when they returned to the last spot they had taken it, someone had beaten them to it. Henson admitted to a history of using and dealing drugs, principally PCP. He said he had approached the authorities about defendant in order to get a deal for a narcotics associate who, when arrested, had declined to implicate Henson.

Specific intent to steal was a necessary element to all the December 23-24 crimes except the sex offenses and the "simple" kidnappings of Randy L. and Corrine S. Dr. Siegel, a psychopharmacologist called by the prosecution, expressed the view that defendant's capacity to form that specific intent had not been diminished by drug use. The witness relied on the absence of evidence that defendant had taken PCP on the day of the crimes, the probable composition of the "crank" defendant had ingested, the mutually counteracting effect of methamphetamines, caffeine, and alcohol, defendant's clear speech and sound coordination during the assault on Randy L. and Corrine S., and the purposeful nature of his activities.

Two Kern County jail guards testified that defendant escaped from custody on August 20, 1980. Defendant overpowered Deputy Sheriff Wiggins during an exercise period; a second inmate, Reynolds, then took Wiggins hostage with a "shank."[6] The two announced escape plans, tied Wiggins up, and, with his directions, opened doors into a multipurpose room, where Wiggins was placed on the floor. The inmates told Wiggins they would kill him unless he cooperated; Reynolds said, "You know what Balderas is in here for. If you don't do what I say, I'm going to turn him loose on you." Wiggins indicated he did not intend to be a hero since he had a wife and children. Defendant replied, "Fuck you and your family, too."

---

[6]A "shank" is a prison-made stabbing weapon.

After the two inmates tried in vain to leave through some ceiling vents, Reynolds directed Wiggins to telephone for outside keys to the exercise yard. Sheriff's Aide Lindini responded to Wiggins' call; he was also taken hostage and relieved of his keys. Lindini and Wiggins, both bound, were locked in an enclosed area. Defendant and Reynolds removed their jail overalls, under which they were wearing street clothes. Defendant took Wiggins' wallet and wore Wiggins' shoes out of the jail. Jail documents recorded the escape.

Evidence was elicited that, while in custody, defendant refused on one occasion to give samples of his blood and pubic hair, but that he was willing to do so at the time of trial.

*B. Defense case.*

The sole defense was that of diminished capacity with respect to the specific-intent crimes (i.e., the robberies of Neil Wanner, Corrine S., and Randy L.; the kidnapping of Wanner for purposes of robbery; and first degree felony murder based on commission of a robbery). The principal defense witness was Ronald Linder, a Ph.D. in health science education who had done extensive research into drug abuse. Linder based his opinion on interviews with defendant, Hix, and Henson. These suggested that defendant was a "chronic poly-drug abuser" who had ingested substantial doses of PCP and "crank" during the week before the charged crimes and was substantially intoxicated on alcohol when he left the December 23-24 party. Linder noted that PCP remains in the tissues for up to a year, increases drive, reduces inhibitions, and causes hallucinations and psychotic symptoms. He expressed the view that defendant "intended" to commandeer the vehicles and to commit the Wanner robbery, but that he would not have committed the crimes of December 23-24 except under the influence of drugs.[7]

## II. Penalty Trial

*A. Prosecution case.*

The prosecution called Dr. Hartnett, a psychiatrist who had done a juvenile court probation evaluation of defendant in 1975. Hartnett testified

---

[7]In interviews with Linder, defendant essentially admitted the charged conduct. On direct examination by defense counsel, Linder disclosed these admissions as bearing on his opinion about specific intent. The jury was admonished to consider defendant's statements to Linder for that purpose only, not as evidence of his guilt. (See *In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Danis* (1973) 31 Cal.App.3d 782, 786 [107 Cal.Rptr. 675].)

that, on the basis of a 45-to-50-minute unstructured interview, he diagnosed defendant as having an "antisocial personality." This condition, Hartnett said, is characterized by callous, selfish, impulsive behavior which frequently brings the subject into conflict with society. Antisocial personalities, he declared, exhibit a lack of loyalty, guilt, remorse, and empathy. They tolerate frustration badly and cannot learn from experience or punishment. They tend to rationalize and blame others. Hartnett said he is cautious in diagnosing this condition, since the potential for improvement is low. Hartnett was not asked for, and did not express, an opinion whether drugs might have influenced defendant's behavior.[8]

On cross-examination, the witness said he administered one intelligence test, which indicated an IQ of 75—"mildly or borderline retarded." The interview also revealed a bad home situation, with many family members living under one roof; defendant said he was in constant conflict with his alcoholic father.

The prosecution introduced evidence of three uncharged robberies in which defendant allegedly participated after his escape from custody. According to restaurant employees, defendant and his fellow escapee, Reynolds, robbed the Cozy Table Restaurant in San Diego on the evening of August 23, 1980. They brandished handguns and forced the manager, Mihalis Rezian, to hand over some $2,000 from the office safe. The restaurant's workers were then placed in the walk-in refrigerator and told they would be killed if they emerged before the robbers left. The two departed in Rezian's car. Rezian and waitress Cheryl Nolan positively identified both robbers in photo lineups two days later.

Defendant and Reynolds were identified as the perpetrators of a similar robbery at a McDonald's restaurant in Santa Clara on the evening of August 30, 1980. Again, both robbers displayed handguns, and employees were herded into the restaurant's freezer. Manager James Judson was divested of his watch and forced to turn over $1,725 from the safe and cash registers. Again, defendant and Reynolds were positively identified by Judson in a photo lineup soon after the robbery.

---

[8]Defendant had moved *in limine* to exclude Hartnett's testimony on grounds it was an improper prediction of "future dangerousness." (See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767 et seq. [175 Cal.Rptr. 738, 631 P.2d 446], cert. den. (1982) 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280].) The trial court concluded that the testimony was proper rebuttal of evidence introduced by defendant at the guilt phase as to the influence of drug use on his crimes. That evidence, the court reasoned, bore on the possible "mitigating circumstances" of "extreme mental or emotional disturbance" and "mental disease or defect, or . . . intoxication" impairing the ability to appreciate criminality or act lawfully. (See § 190.3, subds. (d), (h).)

Two men robbed the Miller's Outpost store in Upland on September 7, 1980. A man identified as Reynolds took manager Timothy Borland into the store's office at gunpoint, where Borland was forced to empty the safe. Meanwhile, the other robber, identified as defendant, held a handgun on other employees, who had been made to lie on the floor. The robbers left with $2,300 in the store's brown leather money bag.

Defendant was arrested in a Houston, Texas apartment on October 5, 1980. During a consent search of the premises, officers found the Miller's Outpost bag with $413 still in it. Photographs were seized which showed Rezian's car and a money bag taken in one of the robberies. Judson's watch was discovered on Reynolds when he was later arrested in Michigan.

The court took judicial notice that defendant had suffered two "prior" felony convictions—for the 1978 and 1980 auto thefts.

### B. Defense case.

Defendant's mother testified to his drug problem but said he was always well-behaved and nonviolent at home. Raymond Gaygan testified he was a family friend who had known defendant all his life; Gaygan never had problems with defendant and knew of no involvement in violence.

The defense called Dr. Drucker, a court-appointed psychiatrist who had also been a pharmacist. Defendant had told Drucker he ingested PCP, "crank," and alcohol during the day and evening of December 23, was "loaded" when he left the party in Hix's car, and was carrying the shotgun for self-protection in light of his drug-selling activities. His memory of abandoning Hix's car was fuzzy, but he remembered most of what had happened with the black couple. Defendant recalled deciding to have forcible sex with the woman. Defendant used more PCP and "crank" the next morning before encountering Wanner, the homicide victim.

According to Drucker, when defendant commandeered Wanner's truck, the victim asked whether he was going to be killed; defendant assured him there was no such intention. At the robbery scene, defendant forced Wanner to strip so he would be handicapped in getting help once defendant left in the truck. The shooting occurred during a struggle for the shotgun after the victim struck him from behind. When the gun fired, defendant panicked; he put a towel on Wanner's wounded leg and fled in the truck. Defendant did not remember a plea for help from the victim; he said, "I could tell by looking at his face he was in pain. I didn't know what to do."

Drucker found planning-type activity in the robbery of Wanner, but not the killing. Defendant, he thought, fired the gun in a state of "excitement, confusion, and intoxication."

On cross-examination, Drucker agreed with the diagnosis of "antisocial personality" and indicated that drugs would simply decrease the judgment with which defendant might otherwise evaluate an opportunity for antisocial behavior. Drucker conceded that defendant knew what he was doing violated the law. Drucker could not say whether defendant behaved more impulsively than if he had been sober.

### III. Pretrial Issues

#### 1. Severance and consolidation of trials.

■ The trial court denied defendant's motion to sever the trial of the kidnappings, robberies, and forcible sex crimes upon Randy L. and Corrine S. from that for the kidnapping, robbery, and murder of Neil Wanner. The court also overruled defendant's objection to consolidation of the trial on those charges with that for the violent escape.

Defendant renews his separate-trial arguments here. He properly concedes, as he did below, that the three groups of charges were properly joined "as a matter of pleading" under section 954.[9] All were of the "same class," in the statute's terminology, since they involved the common element of assaultive behavior against the person. (*People* v. *Rhoden* (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143]; *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 135 [172 Cal.Rptr. 86], cert. den., 451 U.S. 988 [68 L.Ed.2d 846, 101 S.Ct. 2325].) Those charges not related to the escape were also "'connected together in their commission,'" since they shared "'common element[s] of substantial importance.'" (*People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]; *People* v. *Polk* (1964) 61 Cal.2d 217, 230 [37 Cal.Rptr. 753, 390 P.2d 641].) These include the use of a shotgun and an intent to obtain property feloniously. (*People* v. *Pike* (1962) 58 Cal.2d 70, 84 [22 Cal.Rptr. 664, 372 P.2d 656], cert. den., 371 U.S. 941 [9 L.Ed.2d 277, 83 S.Ct. 324]; *People* v. *Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679], cert. den., 361 U.S. 925 [4 L.Ed.2d 241, 80 S.Ct. 296].)

■ Even where joinder is permitted by the statute, the trial court has express discretion to sever counts "in the interests of justice." (§ 954.)

---

[9]Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. . . . [P]rovided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. . . ."

However, defendant can establish an abuse of discretion only "on clear showing of prejudice." (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].)

■ We must evaluate motions for severance and objections to consolidation in light of the showings then made and the facts then known. (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den. *sub nom. Baker* v. *California* (1971) 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462]; *People* v. *Santo* (1954) 43 Cal.2d 319, 332 [273 P.2d 249], cert. den. *sub nom. Graham* v. *California* (1955) 348 U.S. 959 [99 L.Ed.2d 749, 75 S.Ct. 451]; see *People* v. *Clark* (1965) 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856].) ■ The burden of demonstrating that consolidation or denial of severance was a prejudicial abuse of discretion is upon him who asserts it; prejudice must be proved, and "[a] bald assertion of prejudice is not enough." (*People* v. *Kemp* (1961) 55 Cal.2d 458, 477 [11 Cal.Rptr. 361, 359 P.2d 913], cert. den., 368 U.S. 932 [7 L.Ed.2d 194, 82 S.Ct. 359].)

■ Before the trial court, the People urged only that the cases had numerous common witnesses. Defendant, on the other hand, argued only that capital and noncapital charges should never be joined. He provided no further information about how specific prejudice might arise under the circumstances of these cases.

The existence of capital charges certainly bears on the issue of severance (see *Williams, supra,* 36 Cal.3d at p. 453; *Coleman, supra,* 116 Cal.App.3d at pp. 137-140), but nothing in the prior cases suggests that severance is required whenever capital charges are involved. We cannot say, based on the minimal showings made by both parties to the trial court, that it abused its discretion in permitting a consolidated trial.

However, subsequent to the consolidation-severance hearing in this case, we provided, in *Williams,* a detailed description of the factors which should be considered in deciding a request for separate trials. In motions arising after *Williams,* the trial court itself should evaluate these factors. We cannot fault the trial court in this pre-*Williams* case for failing to do so, but, under the circumstances, we deem it prudent, fair, and economical to apply the Williams analysis ourselves to defendant's claim of improper consolidation.

Under *Williams,* the first step in assessing whether a combined trial was prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate

trials on the others. If so, any inference of prejudice is dispelled. (36 Cal.3d at pp. 448-449.)

The People urge that the two December 1979 incidents would have been cross-admissible in separate trials to show a similar modus operandi bearing on identity. (Evid. Code, § 1101, subd. (b).)[10] They further suggest that the 1980 escape would have been admissible in trials of the earlier charges to show consciousness of guilt, also circumstantial evidence of identity. (See, e.g., *People* v. *Holt* (1984) 37 Cal.3d 436, 455 [208 Cal.Rptr. 547, 690 P.2d 1207], and fn. 11; *People* v. *Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961], cert. dism. (1972) 406 U.S. 912 [32 L.Ed.2d 112, 92 S.Ct. 1619].) ▪ ▬▬▬ Defendant contends, however, that identity is an improper basis for cross-admissibility of the multiple crimes, since he conceded that issue in all cases, and it was therefore not " ' 'actually in dispute.' " (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].)[11]

▪ We cannot accept defendant's argument, since it depends on events which occurred at trial and would not necessarily have been apparent at the time the issues of severance and consolidation were decided. (*Clark, supra,* 62 Cal. at p. 883.) There are certain similarities in the two December 1979 incidents—the proximity in time, the commandeering of vehicles, the use of a shotgun, and the partial or complete disrobing of the victims (presumably to hinder them in seeking aid). However, we are not certain they share marks so distinct in number and significance that they logically tend to isolate the same person as the perpetrator of both. (See *People* v. *Thornton* (1974) 11 Cal.3d 738, 755-760 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. (1975) 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], disapproved on other grounds, *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Haston* (1968) 69 Cal.2d 233, 246-247 [70 Cal.Rptr. 419, 444 P.2d 91].)

However, even if evidence on the joined charges would not have been cross-admissible in separate trials, a court does not necessarily abuse its

---

[10]Since the crimes charged here occurred in 1979 and 1980, we need not consider whether section 1101 was affected by Proposition 8, adopted at the June 1982 election. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

[11]In *Thompson,* we explained that even if other-crimes evidence logically bears on a specific issue, such as identity, it is not admissible on that basis, under Evidence Code sections 1101 and 352, if the issue on which it bears is not "actually in dispute." Here, the People presented eyewitness identifications in two of the three charged incidents, multiple extrajudicial admissions by defendant in two, and physical evidence linking him to two. Defense counsel made no serious challenge to this persuasive evidence, presented no alibi, and relied solely on a defense of diminished capacity. Indeed, realizing the limitations of that tactic, counsel conceded to the jury that he had "no real defense" to the general-intent crimes alleged. Thus, he urges, there was no "actual dispute" about identity in any of the cases which would justify cross-admission of evidence from the others.

discretion by joining the cases for trial. ■ "'"[T]he judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses. . . ."'' [A] ruling on a motion to sever is based on a weighing of the probative value as against the prejudicial effect, but in the weighing process the beneficial results from joinder are added to the probative-value side. This requires the defendant to make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (*Williams, supra,* 36 Cal.3d at p. 451, quoting *Matson, supra,* 13 Cal.3d at p. 41; see also *Coleman, supra,* 116 Cal.App.3d at pp. 138-139.)

■ *Williams* suggested that refusal to sever might be an abuse of discretion where (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty. (36 Cal.3d at pp. 452-454; see also *Coleman, supra,* 116 Cal.App.3d at pp. 139-140.)

■ However, as noted, the "substantial" or "clear" prejudice necessary to show abuse of discretion does not depend on the lack of cross-admissibility and the existence of capital charges alone. ■ Determination of a severance issue is "a highly individualized exercise, necessarily dependent upon the particular circumstances of each individual case." (*Williams, supra,* 36 Cal.3d at p. 452.)

■ Defendant suggests he was prejudiced in that a "strong" noncapital case—the robberies and sex crimes against Randy L. and Corrine S.—was joined with a "weaker" capital case—the Wanner homicide—causing a "spillover" effect leading to his murder conviction. Again, however, defendant made no showing before the trial court on specific prejudice which might flow from joint trial of these charges. And even if the trial court had known, at the time defendant moved for severance, the relative strength of the prosecution cases, it would not have abused its discretion in deciding that the beneficial effects of consolidated trial outweighed the potential prejudice.

Defendant argues the evidence in the Wanner case was relatively weak, but his contention is not persuasive. There was no eyewitness to the Wanner homicide, but the evidence connecting defendant to that crime was very convincing. It included the discovery of Wanner's burned and buried wallet in defendant's back yard and defendant's own admissions to two acquaint-

ances. One of these, Joseph Hix, testified he saw defendant commandeer the Wanner truck from the medical center parking lot and later helped defendant dispose of the wallet. The two witnesses agreed on all essential details. We see no substantial likelihood that the overpowering evidence in the Randy L.-Corrine S. case would resolve doubts a jury might otherwise have about the identity of Neil Wanner's killer.

Moreover, while defendant was charged with serious offenses, there was no charge or evidence particularly calculated to inflame or prejudice a jury, such as the child molestation charges in *Coleman* or the "gang warfare" evidence in *Williams.* All the crimes charged here were carried out against adults by an individual whose motives were personal. By the sad standards of the 1970's and 1980's, they were not particularly brutal, repulsive, or sensational. We conclude that defendant has not demonstrated this prong of *Williams* "prejudice."

On the other hand, there were substantial judicial benefits to be gained from a consolidated trial. The two criminal episodes had occurred within hours of each other, and the Wanner robbery and homicide, if prosecution evidence is believed, were essentially an aftermath to events of the previous evening. The court was informed that there would be common witnesses, and that proved true. Two of the principal prosecution witnesses, Hix and Henson, related defendant's admissions to them about both incidents. Hix was also a percipient witness to Wanner's abduction and helped defendant dispose of evidence of the Wanner crimes.

Moreover, defendant presented a diminished capacity defense to all the specific-intent charges (including the robberies of Randy L., Corrine S., and Neil Wanner), based on his ingestion of drugs and alcohol on December 23 and 24, 1979. Two of the witnesses on this issue, psychopharmacologist Siegel for the prosecution and psychologist Linder for the defense, were common to the two incidents, as was most of their testimony.

Finally, Kern County police conducted a common investigation of the two incidents, and it was reasonable to assume that there would be common police witnesses. Under the circumstances, the court could properly conclude that the beneficial effects of a joint trial outweighed its potential prejudice.

■ Defendant urges that it was unduly prejudicial to try the predominantly "general intent" crimes against Randy L. and Corrine S. together with the "specific intent" capital offenses against Wanner, since the only defense offered was diminished capacity. The confusing "mix" of general

and specific intent instructions, defendant urges, deprived him of his sole means of avoiding a conviction for capital murder.

The contention is meritless. On a motion to sever, the trial court could assume the jury would be correctly instructed, as this jury was, about which offenses required specific intent and which were satisfied by general criminal intent.

Moreover, even if a theoretical basis of "diminished capacity" prejudice would have induced a careful trial court to sever cases involving that defense, we can reverse after trial only for a "miscarriage of justice." (See Cal. Const., art. VI, § 13.) In that regard, we note the diminished capacity defense was so weak in all cases that the combination of charges is unlikely to have affected the jury's assessment of that defense in any of them.

Defendant's own expert witness, Dr. Linder, undermined the case for diminished capacity in several respects. He acknowledged that a "chronic poly-drug abuser" such as defendant develops greater and greater tolerance to those drugs—particularly PCP, the most powerful substance at issue here—so that high doses will not necessarily have a fully intoxicating effect.

Dr. Linder further admitted that ingestion of drugs does not necessarily prevent the formation of specific criminal intent. Moreover, in a letter revealed on cross-examination, he set forth defendant's own description of his symptoms under the influence of PCP, which particularly included slurred speech and bad coordination. All witnesses who saw defendant during this period agreed that, except when leaving the party in Hix's car, he did not exhibit those symptoms. Finally, Dr. Linder admitted that, in spite of his alleged intoxication, defendant "intended" to steal Randy L.'s car and also "intended" to rob Neil Wanner in order to buy gasoline.

The prosecution introduced substantial evidence that defendant's actions during both December 1979 incidents were purposeful, rational, and coordinated within the context of the crimes he was committing. Under these circumstances, we cannot conclude that the consolidated trial prejudiced defendant's assertions of diminished capacity.

■ Defendant suggests that joinder was prejudicial under the facts and instructions in this case, since it may have led some jurors to convict defendant of the first degree felony murder of *Wanner* based on evidence that defendant robbed *Randy L. and Corrine S.* This is so, he urges, because neither the instructions nor the verdict forms expressly indicated that defendant must have been engaged in the robbery *of Wanner* in order to be guilty of the first degree felony murder *of Wanner.*

To the extent this is an argument against allowing consolidation, it cannot prevail, since it relies on facts which could not have been contemplated when that issue was decided. To the extent defendant is simply complaining of an ambiguous verdict, his contention is equally meritless. In context, there is no substantial chance the jury was misled, and its murder verdict is not fatally ambiguous. The jurors were told that a robbery continues during "hot flight" or "hot pursuit" from the crime scene but is completed when the robber has eluded his pursuers and reached a place of temporary safety in unchallenged possession of the stolen goods. There was no evidence that defendant was in "hot flight," or was being "hotly pursued," from the Randy L.-Corrine S. robbery at the time he accosted Wanner some eight or nine hours later. Indeed, after abandoning Corrine, defendant simply drove to Hix's house in Randy's Chevrolet. He and Hix then set out on a leisurely journey to recover Hix's abandoned car.

The prosecution focused on the *robbery and murder* of Wanner as a separate incident. The evidence indicated that defendant shot Wanner within moments after robbing him when Wanner's resistance prevented defendant from leaving the crime scene. The jury expressly determined that defendant had robbed *Wanner* and, in its special circumstance finding, that he had killed Wanner while engaged in a robbery. Beyond doubt, if the murder conviction was based on the felony-murder doctrine, the jury found defendant guilty of killing Wanner while engaged in the robbery *of Wanner*.[12]

■ Defendant urges that it is always error to join a capital case with noncapital offenses committed against different victims at a different time and place. Courts must, of course, carefully examine severance motions for potential prejudice which may accrue from a joint trial, and this is particularly true in a capital case. Nonetheless, neither *Williams* nor any other decision suggests such a broad per se departure from the general rule of case-by-case analysis. We decline to adopt defendant's suggestion.

■ Defendant suggests the trial court never truly exercised its discretion, since it was falsely told by the prosecutor that "from half to three-quarters" of the prosecution witnesses were common to the two cases. While this brief comment turned out to be an exaggeration, we doubt the fraction stated was a major influence on the court's decision. Nor is there

---

[12]Nor could the jury have been confused on these facts by the "special circumstance" instruction, which indicated that the special circumstance of murder in the commission of a robbery (§ 190.2, subd. (a)(17)(i)) could be committed by one who was in "immediate flight" after the commission of a robbery. Nothing in the case suggested that defendant was in "immediate flight" from the events of the previous night when he commandeered Neil Wanner's truck. We may therefore also reject defendant's contention that the "special circumstance" finding is compromised by ambiguity over the identity of the robbery victim on which the jury relied.

evidence of bad faith. The prosecutor correctly declared, both in his written opposition and at the severance hearing, that the same law enforcement personnel were engaged in both investigations. He may simply have chosen after the fact to present investigative evidence in the two cases through separate officers. They were a relatively minor element of the trial; as we have seen, several of the most important witnesses were indeed common.

Defendant has failed to demonstrate that the trial court abused its discretion or that he suffered actual, substantial prejudice arising from a joint trial of the charges against him. We conclude that the decision to consolidate the trial, and to deny severance, was not improper.

*2. Venue.*

█ Defendant argues that he was prejudiced by denial of his motion for change of venue. We disagree.

The principles are well-established. █ A change of venue must be granted when the defendant shows a reasonable likelihood that a fair trial cannot be had in the original county. (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240], cert. den., 454 U.S. 882 [70 L.Ed.2d 192, 102 S.Ct. 365].) █ When reviewing the denial of a motion for change of venue, the appellate court makes an independent determination of five controlling factors: the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502].) On postconviction review, we must also examine the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect. (*Harris, supra,* 28 Cal.3d at p. 949.)

█ Defendant was charged with the most serious of offenses, capital murder, and that fact weighs strongly in favor of a change of venue. (*Williams* v. *Superior Court* (1983) 34 Cal.3d 584, 593 [194 Cal.Rptr. 492, 668 P.2d 799].) █ Nonetheless, defendant has failed to demonstrate a reasonable likelihood that he could not obtain a fair trial in Kern County.

The Bakersfield Californian, the county's principal newspaper, the three Bakersfield television stations, and several local radio stations reported the crimes against Randy L. and Corrine S.; the killing of Wanner; the progress of the police investigation; defendant's arrest, escape, crimes while a fugitive, and rearrest; and significant legal milestones in his case (e.g., the preliminary hearing and the mistrial). Coverage occurred only when a new event in the case arose. The most recent newspaper article at the time of

the December 1980 venue hearing was dated a week earlier; it simply reported that the venue motion would be heard.

The Californian's crime reporter acknowledged that the case was "more newsworthy than average" among Kern County's 82 homicides that year because the victim was kidnapped and was from "a fairly prominent part of town," and because of the earlier kidnapping and sex crimes of which defendant was also accused. But the reports were uniformly straightforward and factual. They were not "continuous and extensive" (compare *Williams, supra,* 34 Cal.3d at pp. 590-592) nor exceptionally long or prominent, and they did not dwell on any sensational or hostility-provoking elements of the case. While the matter received the attention due such serious offenses against local citizens, the publicity was "no different in degree or intensity than the usual reporting of other [crimes] of the kind involved here." (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 939 [187 Cal.Rptr. 455, 654 P.2d 225].)[13] Indeed, defendant makes no general claim that the pretrial publicity was unusual, unfair, or inflammatory.

Defendant claims he was prejudiced by newspaper accounts of a *second* escape by Reynolds, who was identified in the articles as the inmate with whom defendant had fled the Kern County jail in August 1980. By coincidence, Reynolds' second escape occurred on December 24, 1980, the first anniversary of the Wanner homicide and less than one month before defendant's trial. While these reports may perhaps have been confusing, the evidence surrounding the voir dire of prospective jurors suggests it had no actual prejudicial effect. (See discussion, *post.*)

The size of the relevant community is also material to the necessity for a venue change. The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness. (*Martinez, supra,* 29 Cal.3d at p. 581.) Kern County, with a 1981 population of 405,600, ranked 14th among California's 58 counties in that respect. (State of Cal., Cal. Statistical Abstract (1981) table B-3, p. 15.) Cases in which venue changes were granted or ordered on review

---

[13]Stories written early in the investigation stressed the authorities' belief that the killing had occurred accidentally when the victim struggled for the gun during a robbery. Before defendant was arrested, two television stations and at least one radio station announced that the county's Secret Witness Program was offering a $1,000 reward for information leading to conviction of the slayer. On March 12, 1980, the day after defendant's arrest was announced, the Californian did run a "human interest" story in which the homicide victim's family was interviewed. The family's responses, to the effect of "it won't bring him back" and "I'm glad they got the guy who did it," were predictable. The longest article in the Californian concerned the jailbreak, and it focused largely on the adequacy of jail security procedures. Singly and in combination, these media references were not at all out of the ordinary for the nature of the crimes charged.

have usually involved counties with much smaller populations. (E.g., *Williams, supra,* 34 Cal.3d at p. 592 [Placer County, 117,000 population]; *Martinez, supra,* 29 Cal.3d at p. 582 [same, 106,500 population]; *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 293, fn. 5 [95 Cal.Rptr. 798, 486 P.2d 694] [Santa Cruz County, 123,800 population, execution-style slaying of prominent physician, sensational publicity, public concern about "hippies"]; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 64 [89 Cal.Rptr. 44, 473 P.2d 748] [Lassen County, 17,500 population, extensive publicity, widespread community hostility]; *Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 52 [84 Cal.Rptr. 135, 465 P.2d 23], fn. 1 [Stanislaus County, 184,600 population, brutal crimes against young adults by outsider to community, sensational publicity]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 385, fn. 10 [66 Cal.Rptr. 724, 438 P.2d 372] [Mendocino County, 51,200 population, confession disclosed, political overtones]; compare, e.g., *Harris, supra,* 28 Cal.3d at p. 949 [San Diego County, over 1 million population].)

The third and fourth factors, the community status of the defendant and of the victim, do not suggest a change of venue was necessary here. Defendant was not an outsider, "friendless in the community," but a lifelong resident of the county. (Compare *Williams, supra,* 34 Cal.3d at p. 594.) He was a member of a minority group, a Mexican-American with an Hispanic surname. Moreover, he would be portrayed at trial as a chronic drug abuser. However, there was no evidence of unusual local hostility to such persons, such that a change of venue would likely produce a less biased panel. Nor was the pretrial publicity calculated to excite local prejudices in this regard. (Compare *Martinez, supra,* 29 Cal.3d at pp. 584, 585.)

Two prospective jurors expressed bias against "Mexicans" and another two said they could not be objective in a case involving drugs. All were excused. So far as the record indicates, defendant had no other associations which might arouse community hostility (compare *Frazier, supra,* 5 Cal.3d at p. 290 ["hippie"-related murder]), and he appears to have been relatively anonymous. (Cf., *People* v. *Jurado* (1981) 115 Cal.App.3d 470, 488 [171 Cal.Rptr. 509].)

All the victims were law-abiding citizens, and two, the jail guards, worked for law enforcement. However, none was especially prominent in the community. Randy L. worked as a mechanic, and Neil Wanner, the homicide victim, was a grocery clerk. The offenses against these persons were of vital concern to their families and friends, but nothing in their status was calculated to engender unusual emotion in the community.

The most compelling reason for rejecting defendant's venue contention is the evidence that, in fact, he was not denied a fair jury. Defendant cites

surveys showing that a substantial percentage of the county's population had some awareness of the case. ■■■ However, with modern communications, "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." Thus, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 756, 81 S.Ct. 1639], quoted in *Harris, supra,* 28 Cal.3d at pp. 949-950.)

■■■ Some 59 members of the venire were examined to obtain the 12 jurors and 3 alternates. Of these 59, 23 professed to know nothing whatever of the case; 11 described only the vaguest recall; and another 11 expressed some familiarity based on media reports. Five others revealed more tangible connections to the events to be tried, and all but one of this latter group were excused for cause.[14] The remaining nine panel members called were never questioned about pretrial publicity, since they were excused on such grounds as medical and financial hardship.

Of the actual jurors, six indicated pretrial ignorance of the case. Another four had read or heard reports, but none had followed the case or recalled many details. Juror Ornelez disclosed he had a friend who was a friend of Neil Wanner's daughter. Juror Essary revealed that the murdered man "or his father" lived next door to her niece; Essary and the niece had discussed that fact but no other details.

All the jurors seated stated unequivocally, on unrestricted voir dire, that they could set aside any impressions formed outside the courtroom and consider the evidence without prejudice. Defense counsel challenged none of the final jurors or alternates for cause, *and he had used only 13 of his 26 peremptory challenges* (§ 1070) when he accepted the jury. These facts are strong indicators that the jurors were fair, and that the defense itself so concluded. (See *Harris, supra,* 28 Cal.3d at p. 950; *Jurado, supra,* 115 Cal.App.3d at p. 491.) In sum, defendant has demonstrated no reasonable likelihood that retention of his trial in Kern County rendered it unfair.

■■■ Defendant claims the court erred at the venue hearing when it refused to consider surveys of community attitudes on the death penalty. Defendant urges these surveys would show that a representative jury cannot

---

[14]Prospective juror Watts said a fellow juror had told him that the other juror might have known the victim. Watts was excused on a peremptory challenge by the defense. Prospective juror Parker was excused for general anti-defense bias after revealing that he had confused defendant's escape with another. Three prospective jurors, Brewer, Moore, and Mino, were excused for cause when they said they had known the victim.

be obtained in a capital case in Kern County because of the large number of persons excludable for absolute pro- or anti-death penalty views.

As the trial court noted, the statistics offered were meaningless on the venue issue, since they afforded no comparisons with statewide attitudes, or with those in adjoining counties. Thus, they provided no basis for concluding that the situation in Kern County was abnormal or that a more representative panel could be convened in another location. ■■ ■ ■ The proffered evidence was properly excluded.[15]

### 3. Double jeopardy.

■ On August 13, 1980, a jury was empaneled and a witness sworn to try the charges involving Randy L., Corrine S., and Neil Wanner. On August 14, Juror Rolnick reported that an investigator for the district attorney's office had telephoned Rolnick's wife to inquire about his views on the death penalty. After hearing testimony from the investigator, Judge Ferguson declared a mistrial.

In his opening brief on appeal, defendant urged that, under the circumstances, further trial of these charges was barred by the double jeopardy clause. His argument was based on the premise that the mistrial was actually declared, and the jury discharged, on August 15, by another judge, on the court's own motion, and without the consent or presence of defendant and his counsel.

The record refutes the contention. The reporter's transcript for August 14 reveals that defense counsel, with defendant present, moved for a mistrial before Judge Ferguson, who granted the motion on that day. The next day, August 15, Judge Jelletich, presiding in another department, convened the jury in Judge Ferguson's absence, advised the jurors of Judge Ferguson's order, and discharged the jury. The court's minute orders show the same sequence of events. Defendant clearly consented to a mistrial, even if he and his counsel were not present when Judge Jelletich performed the ministerial function of dismissing the jury. Hence, defendant waived any double jeopardy claim. (*People* v. *Hathcock* (1973) 8 Cal.3d 599, 613-614 [105

---

[15]Evidence was peripherally introduced at the venue hearing suggesting that blacks and Hispanics were underrepresented on the jury list in comparison to their percentages of the total population of Kern County. A majority of this court recently held that such a showing is sufficient to make a prima facie case of "unrepresentativeness" of the jury panel *on a motion to quash the venire.* (*People* v. *Harris* (1984) 36 Cal.3d 36, 51-55 [201 Cal.Rptr. 782, 679 P.2d 433], cert. den., 469 U.S. 965 [83 L.Ed.2d 301, 105 S.Ct. 365].) Defendant made no such motion here, confining his efforts to the venue issue. Moreover, it is extremely doubtful that the statistics quoted, derived from a survey commissioned by defendant, were reliable enough to satisfy the *Harris* test.

Cal.Rptr. 540, 504 P.2d 476], overruled on other grounds, *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].)

## IV. JURY SELECTION ISSUES

*1. Restriction of defense counsel's voir dire.*

 Defendant argues that the trial court improperly restricted his counsel's voir dire of the jury panel. As defendant notes, the court prevented counsel from questioning prospective jurors about their ability to apply instructions counsel wished to describe on the legal doctrines of circumstantial evidence and diminished capacity. We conclude there was no error or prejudice on the particular facts.

A juror may be excused for cause if he or she reveals "actual bias," that is, "a state of mind . . . in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, . . ." (§ 1073.) While counsel may not use voir dire for the purpose of instructing, educating, cajoling, or prejudicing the jury, he may conduct a reasonable oral inquiry of prospective jurors to determine the basis of a challenge for cause. (§ 1078; *People* v. *Crowe* (1973) 8 Cal.3d 815, 824 [106 Cal.Rptr. 369, 506 P.2d 193]; *People* v. *Edwards* (1912) 163 Cal. 752, 753 [127 P. 58].)

 At the time of defendant's trial, counsel was precluded from asking questions pertinent only to a possible *peremptory* challenge. (*Edwards, supra.*) Under this rule, it was not clear whether jurors could be examined on their attitudes about *specific doctrines of law* in order to uncover the "actual bias" necessary to a challenge for cause. Some cases suggested that such specific inquiries might sometimes be necessary to reveal actual bias. (E.g., *People* v. *Love* (1960) 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705], fn. 1, citing *People* v. *Wein* (1958) 50 Cal.2d 383, 394 [326 P.2d 457], cert. den., 358 U.S. 866 [3 L.Ed.2d 99, 79 S.Ct. 98], overruled on another ground, *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]; and *People* v. *Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1] [both involving death qualification]; *People* v. *Tuthill* (1947) 31 Cal.2d 92, 98 [187 P.2d 16], cert. den. (1948) 335 U.S. 846 [93 L.Ed.2d 396, 69 S.Ct. 57] [questions about juror understanding of various legal principles not prejudicially erroneous].) However, another body of authority disapproved the practice, ruling that a trial court need permit no further examination once it had allowed reasonable questioning on jurors' ability to follow the law in general. (E.g., *People* v. *Soltero* (1978) 81 Cal.App.3d 423, 428-429 [146 Cal.Rptr. 457], cert. den., 439 U.S. 933

[58 L.Ed.2d 328, 99 S.Ct. 325]; *People* v. *Orchard* (1971) 17 Cal.App.3d 568, 576 [95 Cal.Rptr. 66].)

In *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869], decided six months after defendant Balderas' trial, this court abrogated the *Edwards* rule that questioning could only pertain to challenges for cause. *Williams* concluded that reasonable examination of juror attitudes on relevant doctrines of law should be permitted, since it might reveal a subtle or unconscious bias calling for exercise of a peremptory challenge. (Pp. 402-412.)

 *Williams* applies only to trials conducted after it was filed, except for the trial of the defendant in that case. (P. 412, fn. 15.) However, this court has never ruled on the question left unresolved by *Williams*—whether reasonable inquiry into specific legal prejudices must be permitted *as the basis for a challenge for cause*. We now conclude that reasonable questions of this kind should have been permitted under the prior rule. Persons who harbor legal prejudices pertinent to the trial display "actual bias," since they are unable to act with the "entire impartiality" required of jurors.

Though *Williams* is not directly on point, its reasoning logically extends to the issue presented here.[16] *Williams* noted at length the increasing modern awareness that general questions about a prospective juror's willingness to "follow the law" are not well calculated to reveal specific forms of prejudice and bias. In the first place, general questions about whether a juror will follow instructions have only one "right" answer—"yes." One who wishes to seem fair-minded in the company of peers is unlikely to give a negative response.

More fundamentally, a panel member may reply to such questions in entire good faith, having no knowledge of the specific doctrines and principles he or she will be asked to apply. "His answer may be true to the extent that he is willing generally to act as the judge instructs him. But it is untenable to conclude that the veniremen's general declaration of willingness to obey the judge is tantamount to an oath that he [*sic*] would not hesitate to apply any conceivable instruction, no matter how repugnant to

[16]In his dissenting opinion, Justice Lucas criticizes the "majority, in cases such as [*Williams*] and the present case," for allegedly "ignor[ing]" the teachings of Justice Tobriner in *People* v. *Crowe* (1973) 8 Cal.3d 815, 819 [106 Cal.Rptr. 369, 506 P.2d 193].

We observe that the basic holding in *Williams,* which extended voir dire beyond questions involving challenge for cause, was unanimous. The Chief Justice disagreed only as to the scope of the new standard, and Justice Richardson disagreed only as to prejudice. Justice Tobriner, of course, was among those concurring.

him. [Fn. omitted.] Hence the answer is merely a predictable promise that cannot be expected to reveal some *substantial overtly held bias* against particular doctrines. . . ." (*Williams, supra,* 29 Cal.3d at p. 410, italics added.)

The *Edwards* rule was intended to prevent time-consuming abuses of the voir dire process, not to preclude examination truly relevant to overt bias. Even if a juror has proclaimed his general willingness to follow the law and instructions, the rule should not prohibit further reasonable questioning calculated to elicit a juror's *admission* of *actual unwillingness* to apply a particular rule of law pertinent to the impending trial. ▮▮ ▮▮▮ Any overt resistance of that kind and degree would form the basis for a challenge for cause on grounds of "actual bias."[17]

▮▮ On the other hand, courts have always had the power to preclude questions which are merely instructional or argumentative, or which will consume undue time without a substantial likelihood that they will reveal grounds for a challenge. Again, *Williams* provides an appropriate standard: questioning need be allowed only on a doctrine both material to the trial and controversial. (29 Cal.3d at p. 410.)

▮▮ Here, defendant claims that the court wrongly barred questions about jurors' willingness to apply instructions on circumstantial evidence and diminished capacity. Any limitation on "circumstantial evidence" questions was not an abuse of discretion, we think, since an average juror would probably not disagree with the court's instructions. On the other hand, it is well known that a substantial segment of the public looks with disfavor on the controversial doctrine of diminished capacity. The court was aware that diminished capacity principles were likely to play a major role in the trial; indeed, diminished capacity was the sole defense offered at the guilt phase.

---

[17]In so holding, we do not depart from the general rule that a juror's answers on voir dire are presumed true. (E.g., *People* v. *Preston* (1973) 9 Cal.3d 308, 312-313 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Magee* (1963) 217 Cal.App.2d 443, 473 [31 Cal.Rptr. 658], cert. den. (1964) 376 U.S. 925 [11 L.Ed.2d 620, 84 S.Ct. 688].) This rule means only that courts may not speculate after the fact on the veracity of the answers given to questions *actually asked.* It does not limit the scope of the questioning. Indeed, a juror's claim that he or she can follow the law generally may be "true" as far as it goes, since the juror may not be aware of a specific bias bearing on the case until confronted with it through careful voir dire examination. (See text discussion, *ante.*) In any event, the presumption of truth can always be rebutted by other jurors' affidavits that one of their number concealed bias by giving false answers on voir dire. (E.g., *People* v. *Castaldia* (1959) 51 Cal.2d 569, 572 [335 P.2d 104].) It therefore seems logical that counsel should be permitted to use the questioning process itself to uncover actual bias, conscious or unconscious. Of course, if a juror stated clearly in response to appropriate questions that she or he could apply a particular doctrine without bias, the answer should be taken as true for purposes of a challenge for cause. Courts may always prevent repetitive questions designed to "badger" a juror into a false admission of bias.

At the time of the court's ruling, one prospective juror had already volunteered that he could not "go along" with the notion that drug or alcohol use absolves someone of responsibility for criminal acts. Thus, the court would have erred had it unduly restricted counsel from probing jurors' attitudes toward that doctrine.

However, the record suggests that voir dire was not unreasonably confined. The diminished capacity issue was well aired, and any deficiency in examination arose primarily from the defense's own lack of diligence.

Voir dire proceeded as follows: the court first addressed general questions to the entire venire panel; included were general questions on ability and willingness to follow the law. The names of 12 panel members were then drawn by lot, and they were seated in the jury box. After further preliminary questions from the court designed to elicit grounds for hardship excuse or obvious bias, each of the 12 was questioned individually in chambers for purposes of death qualification. (*People* v. *Hovey* (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301].) Any juror who survived challenge at that stage returned to the jury box, where he was further examined by both counsel in the presence of other panel members. Counsel admonished the other jurors present to respond if their answers would be different than those of the juror actually being questioned. Whenever any juror was excused, another's name was drawn by lot, he was seated, and the process continued in that fashion until both counsel had accepted the jury.

Early in the voir dire, the prosecutor told the panel that jurors would have to decide more than "who done it"; all elements of the crimes, including mental state, must be proved beyond a reasonable doubt. Several times during the first two days, he mentioned without objection from defense counsel that the evidence might include defendant's consumption of drugs or alcohol. He further explained that the case might involve the effects of such substances on defendant's mental state and that both sides might introduce evidence, including expert psychological testimony, on this issue. The prosecutor asked if any of these things might prejudice jurors against defendant, if they could evaluate expert psychological testimony fairly, if they had "any difficulty" with "any body of law" mentioned, and if they believed persons are automatically absolved of responsibility for acts they commit while under the influence of drugs or alcohol.

As noted, prospective juror Smith volunteered during such questioning that he could not "go along" with the notion that intoxication diminishes criminal responsibility. The juror was dismissed on a peremptory challenge by the defense, but defense counsel did little else during this period to pursue juror attitudes on the diminished capacity doctrine.

On January 28, 1981, the third and final day of voir dire, cocounsel Birchfield, who had not previously taken part in defense voir dire, examined a prospective juror for the first time. He began to question the juror, Ms. Essary, as follows: "Mr. Leddy [the prosecutor] has talked about circumstantial evidence and the Court, at the latter stage of the trial, will give you a specific instruction dealing not only with what is circumstantial evidence but how you, as a juror, are to view this evidence *and one of the instructions deals with the possibility—*." (Italics added.) The court cut counsel off in midsentence, saying it did not wish counsel to talk about specific instructions on circumstantial evidence. The court advised that counsel could ask whether the juror would follow instructions on circumstantial evidence whether she agreed or not, but could not "get specific in telling her what the law is in that regard."

After a brief off-the-record discussion at the bench, court and counsel retired to chambers. There counsel asked if the court's ruling on avoiding discussions of "the law in particular" applied to the diminished capacity doctrine as well. The court replied that it covered all attempts to instruct or argue to the jury, "and that's a matter of degree." The court noted that it had given both counsel "considerable leeway" in discussing "diminished capacity, state of mind, . . . drugs, [and] intoxication, *but it's when you start getting into the specific instructions and what they say,* I'm going to cut you off." (Italics added.)

Counsel argued that some discussion of law was necessary "to have an intelligent and complete voir dire on such a serious case." The court responded, "I don't care if, certainly on diminished capacity, you can . . ., you haven't been instructing on the law, as I deem it, . . . I don't think you have to read an instruction to—you fellows know what I am talking about. . . . [¶] I know when you are attempting to instruct the jury on a particular point and trying to get that point across to them. You repeat it and repeat it. I don't want you to do that and I think that is the situation here. . . . [¶] You know, I'm just going to stop it before we start. All right. I think the record is clear. . . ."

Thus, the court drew the line at instructional questions, but it clearly did not preclude a probe of juror attitudes on the general principle that culpability might be affected by mental state or intoxication—the controversial essence of the diminished capacity doctrine. Indeed, as the court noted, the prosecutor had been able to ask pertinent questions on the issue without resorting to instruction.

At the time of the court's ruling, only 11 of the 48 panel members remained to be questioned before a 12-member jury was accepted by both

sides. One of the remaining jurors, Ms. Hosking, replied "no" in open court when asked if she could be fair. Examined in chambers at her own request, the juror explained she "understood that drugs were related to this case, and I have an unswerving disability to hear anything good about drugs." "[M]y feeling," she declared, "is that the use of drugs does not eliminate your responsibility in any way." She was excused for cause by stipulation. The other remaining jurors, who had been present throughout the open-court voir dire sessions, responded on individual examination that they could be fair and would not answer differently any of the questions posed to other jurors. Defense counsel made *no* further effort to explore attitudes about drugs, intoxication, mental state, or the effects of these things on criminal responsibility. Five of the eleven remaining panel members ended up on the final jury.

In sum, it appears the prospective jurors were well aware that a defense based on mental state, intoxication, and drug use was at issue. All members of the final jury declared, both as a group and individually, that they would not let these facts affect their deliberations. Counsel sought permission for more detailed questioning only late in the voir dire process. He failed at all times to take full advantage of the considerable latitude he *was* allowed in exploring juror bias. Hence, for purposes of possible challenges for cause, the jurors' general declarations of fairness must be presumed true.

Moreover, two prospective jurors were excused because of their attitudes on the diminished capacity issue, and counsel made no further challenges on this ground. He accepted the jury after using only half his available peremptory challenges. Under these circumstances, we cannot say that the court's restriction on voir dire questioning was improper or prejudicial.

2. *Effect of court's voir dire on juror attitudes toward guilt or innocence and penalty.*

During the sequestered voir dire process for death qualification (see *Hovey, supra,* 28 Cal.3d at pp. 80-81; see also *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-523 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770]), the court asked each individual panel member, out of the presence of other prospective jurors, five questions, which may be paraphrased as follows: (1) Would you automatically refuse to impose the death penalty regardless of the evidence or the law in the case? (2) If defendant were found guilty of first degree murder with special circumstances at the guilt phase, would you automatically vote to impose the death penalty without regard to the evidence or the law? (3) Would your death penalty views prevent you from making an impartial decision as to the defendant's guilt? (4) Are your views such that you would never vote to impose the death penalty? (5) Are your

views such that you would refuse to consider imposing the death penalty *in this case?*

Defendant contends that the form of these questions, posed by the figure to whom jurors most look for guidance, made the jurors unduly guilt- and death-prone. In particular, defendant urges, question (4) unnecessarily repeated question (1), and both concentrated the juror's attention on the judge's opinion that this was a case in which the death penalty might be appropriate. Moreover, defendant suggests, question (5), by warning the juror against absolute opposition to the death penalty "in this case," further implied that "this case" was one in which the court believed the penalty of death might be warranted.

We agree that the questions could have been drafted more artfully, but we see no prejudicial error. We note at the outset that defense counsel never objected to any of the court's questions, either in form or in substance. Beyond that, we think the questions were reasonable attempts to isolate jurors excludable for cause because of their absolute bias *for or against* the death penalty. (*Witherspoon, supra;* see *Hovey, supra,* 28 Cal.3d at pp. 20-21, and fn. 4; *People* v. *Hughes* (1961) 57 Cal.2d 89, 94-95 [17 Cal.Rptr. 617, 367 P.2d 33].) The questions aimed at *anti*-death penalty scruples seemed intended to satisfy *Witherspoon*'s mandate that a juror could not be excluded for views against the death penalty unless he made it "unmistakably clear" that those views would force him to vote against death regardless of the law or evidence, or would prevent him from judging the issue of guilt or innocence fairly. (391 U.S. at pp. 522-523, fn. 21 [20 L.Ed.2d at p. 785].)

Our decisions under *Witherspoon* interpreted that limitation strictly. In *People* v. *Williams* (1970) 71 Cal.2d 614 [79 Cal.Rptr. 65, 456 P.2d 633], we concluded that "we must regard with considerable suspicion and disfavor any exclusion of a juror—where the *voir dire* examination was subsequent to the *Witherspoon* decision—which is not based on a question phrased in the terms *Witherspoon* so unmistakably suggests." (P. 634.) In *People* v. *Lanphear* (1980) 26 Cal.3d 814 [163 Cal.Rptr. 601, 608 P.2d 689] (*Lanphear I*), we affirmed that any ambiguity in a question posed on the *Witherspoon* issue might rob the answer of the unmistakable clarity necessary to uphold an exclusion for cause on review. (P. 841.) We later reiterated our opinion in *Lanphear I* after it was vacated and remanded by the United States Supreme Court. (*People* v. *Lanphear* (1980) 28 Cal.3d 463 [171 Cal.Rptr. 505, 622 P.2d 950] (*Lanphear II*).)

Faced with our insistence on precise *Witherspoon* questioning, this trial court may have sought to protect its record by exhaustive and careful voir

dire phrased in all possibly relevant language of *Witherspoon*. ██ ██ We must view its efforts in that context.[18]

 Here, question (1) is an obvious reference to *Witherspoon*'s ruling that states may exclude jurors who unequivocally say "that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785], italics in original.) Question (4) appears to phrase the same issue in different words, and it does not derive directly from a *Witherspoon* quotation. However, the court may have felt that question (1) offered enough opportunity for juror misunderstanding that even an unequivocal answer to that question alone would be ambiguous.

Question (5) seems addressed to the passage in *Witherspoon* which provides that "[a] prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death *regardless of the facts and circumstances that might emerge in the course of the proceeding. . . .*" (*Ibid.*, first italics in original.) In light of the historic difficulties in applying the *Witherspoon* doctrine, we cannot say that the mere predominance of *anti*-death penalty over *pro*-death penalty questions rendered the court's voir dire an abuse of discretion.

Nor on this record can we determine that any error was prejudicial. Defendant argues that extensive questioning on the death penalty issue by the court's most respected figure desensitizes the jurors to their sentencing responsibility and subconsciously persuades them, even in advance of the guilt trial, that the case is a proper one for consideration of the extreme punishment. In *Hovey, supra*, we found, *on the basis of extensive studies cited by the petitioner there,* that such effects may arise from a process of death

---

[18]*Witherspoon* was the law at the time of defendant's 1981 trial, but in a recent decision, the United States Supreme Court has drastically limited *Witherspoon*. The new opinion, *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], declares that the correct standard for exclusion is whether a prospective juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [Fn. omitted.] . . ." (469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], quoting *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589, 100 S.Ct. 2521].) Under *Wainwright*, moreover, the juror need not make his attitude "unmistakably clear"; the trial court's finding of juror bias will be upheld if substantially supported by the record. (469 U.S. at pp. 432-433 [83 L.Ed.2d at pp. 856-857].) Whatever *Wainwright*'s effect on appellate review of *Witherspoon* exclusion issues arising in trials conducted before *Wainwright*, we must view the propriety of the trial court's *questioning* in this case in light of the legal principles then extant.

qualification *in open court.* (28 Cal.3d at pp. 69-80.) The principal vice we perceived in the open-court process was that it caused each prospective juror to be bombarded with the death-penalty questions and instructions directed at all the other panel members. After witnessing this repetitive process, conducted by the court and its respected officers, a juror could be expected to accord the death-qualification issue undue emphasis in subsequent deliberations on both guilt and penalty. (*Ibid.*)

We acknowledged in *Hovey* that the sequestered death qualification procedure might not eliminate all the "untoward effects" of that process. We also conceded that the extensive *Witherspoon* questioning sometimes required to eliminate ambiguous juror responses might have similar bias-inducing effects, even in a sequestered setting. However, we said *"[i]t is unknown* at this point whether such personal voir dire would entail the same dangers of inducing bias as do the current procedures for voir dire." (*Id.,* at p. 81, italics added.) Here defendant has cited no evidence, and we know of none, which suggests that a court induces pro-guilt and pro-death bias simply by asking a sequestered juror more questions about his unwillingness to impose the death penalty than about his preconceived intention to do so.

The trial court consistently advised sequestered jurors that the penalty phase would be reached only if defendant was found guilty of first degree murder with special circumstances at the first phase of the trial. It also made clear that the penalty decision, if one was necessary, would be in the jury's hands. The court's voir dire questions were framed in that context. Counsel was given full opportunity to question each juror further on his death penalty views. One juror was excused by stipulation for *pro*-death penalty views, but none was challenged or excluded on *Witherspoon* grounds. All members of the final jury insisted they could follow the law on guilt and penalty, and, as noted, defendant accepted the jury after using only half his peremptory challenges. ▮▮▮▮ We see no substantial probability that the form of the court's questions prejudiced the jury's impartiality.[19]

---

[19]*Hovey* arose on a pretrial petition for mandamus; the principle of sequestered voir dire we there announced was justified by our supervisory powers, not on constitutional grounds, and it was made prospective only. (28 Cal.3d at p. 80.) We thus have never decided when claims of a bias-inducing death qualification procedure, raised as a matter of first impression, would support reversal of a conviction on appeal. Of course, erroneous *exclusion of a juror* in violation of *Witherspoon* was grounds for reversal per se, but there appears no reason to judge objections to the form of voir dire by that harsh standard. Where no contention is made that a juror was improperly excluded, we will evaluate all the facts and circumstances for probable prejudice when reviewing a posttrial claim that voir dire questions had an unfair effect on unexcluded jurors. (Cf., *Harris, supra,* 28 Cal.3d at p. 949 [effect of pretrial publicity on juror bias].)

*3. Exclusion from jury of persons unable to impose death penalty as denial of representative jury at guilt phase.*

 Defendant claims that the exclusion of persons who state they cannot vote for the death penalty (*Witherspoon, supra,* 391 U.S. 510, 521-522, fn. 21 [20 L.Ed.2d 776, 785]) denies a capital accused a guilt jury which is representative of the community. He lacks standing to make the claim, since no prospective juror in his case was excluded on *Witherspoon* grounds. (See *People* v. *Velasquez* (1980) 26 Cal.3d 425, 433 [162 Cal.Rptr. 306, 606 P.2d 341], vacated and remanded, 448 U.S. 903 [65 L.Ed.2d 1132, 100 S.Ct. 3042], reiterated, 28 Cal.3d 461 [171 Cal.Rptr. 507, 622 P.2d 952].) In any event, we have consistently rejected similar contentions. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]; *People* v. *Zimmerman* (1984) 36 Cal.3d 154, 161 [202 Cal.Rptr. 826, 680 P.2d 776]; *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680] [pl. opn.], see also pp. 374-375 [conc. opn. of Kaus, J.], cert. den. (1984) 469 U.S. 892 [83 L.Ed.2d 204, 105 S.Ct. 267].)[20]

## V. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

*1. Restriction on cross-examination of prosecution witness.*

Defendant urges that, in two instances, he was improperly restricted in his cross-examination of Joseph Hix, a major prosecution witness. We find no merit in either claim.

 Defendant first urges the trial court erred in sustaining an objection to counsel's question whether Hix and defendant had taken narcotics at defendant's house on days *other than* December 24—the date on which, according to Hix, defendant made his incriminating admissions. Defendant urges that evidence of habitual narcotics use would have impeached Hix's general recall and perceptive abilities.

Evidence of habitual narcotics or alcohol use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties. (*People* v. *Pargo* (1966) 241 Cal.App.2d 594, 600 [50 Cal.Rptr. 719]; see *People* v. *Ramirez* (1969) 2 Cal.App.3d 345, 350 [82 Cal.Rptr. 665], disapproved on other grounds, *People* v.

---

[20]We note that the United States Supreme Court recently granted certiorari to review the only contrary federal decision. (*Grigsby* v. *Mabry* (8th Cir. 1985) 758 F.2d 226, cert. granted *sub nom. Lockhart* v. *McCree* (Oct. 7, 1985) — U.S. — [88 L.Ed.2d 48, 106 S.Ct. 59].)

*Schueren* (1973) 10 Cal.3d 553 [111 Cal.Rptr. 129, 516 P.2d 833]; *People v. Stanley* (1962) 206 Cal.App.2d 795, 798-799 [24 Cal.Rptr. 128, 8 A.L.R.3d 745]; Witkin, Cal. Evidence (1966) Introduction of Evidence at Trial, § 1228, pp. 1134-1135; cf., *People v. Rocha* (1971) 3 Cal.3d 893, 901 [92 Cal.Rptr. 172, 479 P.2d 372].) Defendant offered no such evidence; the court's ruling was proper. In any event, Hix's testimony was replete with the details of his and defendant's habitual joint use of narcotics. Hence, there was no prejudice.

 At another point in cross-examination, counsel asked Hix, "You were in custody a few months ago, were you not?" The witness replied, "Yes." On the prosecution's motion, the answer was stricken and the jury admonished. Defendant argues this was error, since the question and answer were relevant to possible promises of leniency in return for false testimony at defendant's trial.

In context, the contention cannot be sustained. The record shows that the court initially *overruled* the prosecution's objection to the "custody" question and answer. The following interchange then occurred: "MR. LORENZ [defense counsel]: Q. Did you talk to Mr. White [a prosecution investigator] about shortening your sentence or getting some kind of a deal? [¶] A. I didn't talk to Mr. White at all. [¶] Q. Who did you talk to about that? [¶] A. Nobody. [¶] MR. LORENZ: Nobody. *All right. That's all I have.*" (Italics added.)

Court and counsel then retired to chambers, where the prosecutor moved to strike *only* the "custody" question and answer. Defense counsel stated he "understood" that Hix had been in custody on a misdemeanor drunk driving conviction, had several other misdemeanor charges pending at the time, and was approached by the authorities about reduction or elimination of the *pending* charges in return for his testimony. Counsel said he could not confirm his "understanding" because he had no access to police and custodial records. The court replied that it saw no relevance in the "custody" issue unless defendant could show Hix received some consideration *on that sentence.* However, it left the matter open to further discovery on whether Hix's custody might have been related to a deal with the authorities. The issue never arose again.[21]

 Prior felony convictions are sometimes admissible to impeach a witness' credibility (Evid. Code, § 788), but "custody" on misdemeanor

---

[21]Defendant suggests the trial court was under the mistaken impression that the fact of custody could *not* be proved by the witness' admission, but must be established by official documents. The record makes clear that this was not the basis of the court's ruling.

charges generally is not (*id.*, § 787). ▓▓▓ Of course, an accused has a confrontational right to expose a witness' bias or motive to lie. Promises, expectations, or hopes of leniency from the authorities, however unreasonable, may supply such a motive. (*Davis* v. *Alaska* (1974) 415 U.S. 308, 315-318 [39 L.Ed.2d 347, 353-354, 94 S.Ct. 1105]; *People* v. *Allen* (1978) 77 Cal.App.3d 924, 931-932 [144 Cal.Rptr. 6]; *People* v. *Brown* (1970) 13 Cal.App.3d 876, 883 [91 Cal.Rptr. 904], disapproved on other grounds, *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698 [135 Cal.Rptr. 392, 557 P.2d 976]; see *People* v. *Lent* (1975) 15 Cal.3d 481, 484-485 [124 Cal.Rptr. 905, 541 P.2d 545].) ▓▓▓ The fact of Hix's "custody" might therefore be relevant if the *custody itself* formed the basis for a deal, *or* if the *fact of custody* made Hix more vulnerable to a deal on the other pending charges.

The court was probably wrong if it believed that counsel must make a *prima facie* case on the witness' motivation before exploring the issue by direct examination of the witness. The normal remedies against repetitive or "badgering" questions were available.

Here, however, at a time when the "custody" admission was *still on the record,* counsel himself abruptly cut off inquiry into the possibility of a related deal, which inquiry had not been restricted, with the comment, "[t]hat's all I have." Thereafter, in chambers, the court struck *only* the "custody" reference, leaving the remaining discussion of a deal intact. The court stressed that it would not restrict questions directed at a possible deal and would be willing to rule again on the "custody" issue if more information turned up. Counsel never pursued the matter further. Under the circumstances, defendant's claim that the "custody" ruling unduly restricted his inquiry into a deal is unpersuasive.

### 2. Prosecutorial misconduct.

▓▓▓ The jury was instructed that an accomplice's testimony must be corroborated and viewed with caution, and defendant claims Hix was an accomplice as a matter of law. Hence, he urges, the prosecutor committed misconduct by arguing to the jury that Hix was not an accomplice.

The evidence suggests Hix lent defendant his car to leave the December 23-24 party, drove defendant to the scene of the Wanner kidnapping, knew of defendant's intent to rob Wanner, later helped defendant dispose of Wanner's personal effects, may have helped strip Randy L.'s car, and was granted immunity for his testimony. ▓▓ ▓▓ ▓▓ But Hix's assistance in disposing of evidence of the various crimes makes him, at most, an accessory after the fact; a mere accessory is not an accomplice. (*People* v. *Hoo-*

*ver* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)[22] ■
An aider and abettor may be an accomplice since he is chargeable as a principal (*Hoover, supra*), but we recently affirmed that one is not guilty of aiding and abetting a crime unless he promotes, encourages, or assists the perpetrator *and shares the perpetrator's criminal purpose.* It is not enough that the person charged as an aider and abettor give assistance with *knowledge* of the perpetrator's criminal purpose. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 556-561 [199 Cal.Rptr. 60, 674 P.2d 1318].)

■ Here, there was no evidence that Hix lent defendant his car with knowledge or intent that it would assist defendant in the commission of crimes. Though Hix and defendant later drove to the hospital for the criminal purpose of stealing money from parked cars, Hix immediately disassociated himself from defendant's new plan to rob Wanner, saying he wanted no part of a robbery. He then drove away, leaving defendant behind. Such acts are insufficient under *Beeman* to make Hix an accomplice, and we see no impropriety in the prosecutor's argument.

### 3. *Evidence of defendant's refusal to give blood and pubic hair samples.*

On August 1, 1980, five months after defendant's arrest and twelve days before the first trial was to begin, the prosecution obtained a court order for blood and pubic hair samples from defendant. Apparently, these were to be compared with the vaginal materials collected from Corrine S. On August 13, while defendant was in custody awaiting trial, a Kern County deputy sheriff attempted to collect the samples. After consultation with counsel, defendant refused on grounds the demand was untimely. Thereafter, a mistrial was declared. (*Ante,* pp. 181-182.) Defendant escaped from custody on August 20 and was recaptured in October 1980.

On January 22, 1981, four days before the second trial was scheduled to start, Bakersfield Police Officer Glaser again sought the samples. Defendant

---

[22]As *Hoover* explained, an "accomplice" whose testimony must be corroborated is defined by statute as "one who is liable to prosecution for the *identical offense* charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111, italics added.) "In order to be charged with the identical offense as the defendant it would be necessary for the witness to be considered a principal under the provisions of section 31, which includes '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and encouraged its commission. . . .'" One liable only as an accessory under the separate provisions of sections 32 and 33 is not chargeable with an "identical offense." (12 Cal.3d at p. 879.)

Section 32 defines an accessory as one who, "after a felony has been committed, harbors, conceals or aids a principal in such felony" with guilty knowledge and purpose. Section 33 limits the punishment for accessories, except as otherwise provided, to a $5,000 fine, imprisonment in state prison for five years or in the county jail for one year, or both such fine and imprisonment.

refused. Counsel, coincidentally in the jail on another matter, was summoned for consultation. He again advised defendant not to obey the "untimely" demand. No samples were taken.

On the morning of February 3, 1981, the sixth day of trial, the prosecutor sought to elicit from Glaser the fact of defendant's refusal to give samples, apparently to show consciousness of guilt of the sex crimes. Defense counsel objected. A discussion followed in chambers. Glaser was questioned on voir dire about the events of January 22. The court suggested that the *first* January 22 refusal, made before consultation with counsel, might tend to show guilty knowledge. However, the court concluded that it would issue a new order for samples; if defendant complied with the new order, *all* evidence of prior refusals would be excluded. Counsel promised defendant would comply.

Following the noon recess, the prosecutor advised that the police chemist saw no use for samples at that time, since the swab taken from Corrine S. in December 1979 was too old to yield a reliable comparison. Indeed, the prosecutor conceded, the chemist now advised that the same would have been true of samples collected *at any time* under the August 1, 1980, order. The prosecutor had also previously stated that no foreign pubic hairs were found on Corrine S.

Nonetheless, under these circumstances, the court ruled that the first January 22 refusal was admissible. This evidence was obtained from Glaser. Glaser acknowledged on cross-examination his awareness that defendant was "now" willing to give samples.

 Defendant urges that his refusal should have been excluded, because the prosecution acted in bad faith. He suggests the authorities deliberately delayed their demands for samples until just before the scheduled trials in order to rob the defense of time to refute any incriminating test results. Alternatively, he asserts, the prosecution "knew all along" that the tardy samples were useless and made the demands only to trap defendant into incriminating refusals.

We need not decide whether defendant's refusal to give samples should have been excluded, either for "bad faith" or for irrelevance, since we see no reversible prejudice. Other evidence that defendant committed the charged sex crimes against Corrine S. was overwhelming. The fact of defendant's refusal to give samples was revealed very briefly. This evidence, weakly incriminating at best, was balanced on cross-examination by the disclosure that defendant later became willing to give samples. The jury never heard that, in the interim, the usefulness of the samples to the pros-

ecution had been called into question. We do not think it reasonably probable that omission of the evidence would have altered the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], cert. den. (1957) 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].)[23]

### 4. *Voluntary manslaughter instruction.*

 With respect to the charge of first degree murder of Wanner, the jury was instructed on the lesser included offense of voluntary manslaughter. The instruction defined only the "nonstatutory" version of that offense, based on diminished capacity. (See, e.g., *Tidwell, supra,* 3 Cal.3d at p. 86.)[24]

 Defendant urges that he was also entitled to a *sua sponte* instruction defining voluntary manslaughter as a killing "upon a sudden quarrel or heat of passion." (§ 192, subd. 1.) He points to the evidence that he shot Wanner when provoked by the victim's attack during the robbery. The contention lacks merit.

The jury was instructed on all degrees and theories of murder, including first degree murder based *both* on premeditation and on the felony-murder doctrine. First degree premeditated murder, and all other murder not predicated on commission of an underlying felony, requires the element of "malice." (§ 187.) A killing "upon a sudden quarrel or heat of passion" is deemed voluntary manslaughter rather than murder in the sense that it is an unlawful intentional homicide "without malice." (§ 192.)

The provocation or "heat of passion" necessary to reduce a *murder based on malice* to manslaughter must be such as would arouse feelings of pain or rage in "an ordinarily reasonable person" or "an ordinary man of average disposition." (*People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].) The "heat of passion" instruction is not warranted if there is no cognizable evidence on that theory. This court has

---

[23]The same is true of defendant's claim that the jury should have been admonished to limit its consideration of the refusal to the crimes against Randy L. and Corrine S. It seems highly unlikely the jury used defendant's refusal to give samples, readily understood as pertinent to sex crimes, as evidence that he later killed Wanner. Indeed, an admonishment might have worked to defendant's disadvantage by focusing the jury's attention on a very minor bit of testimony.

[24]Where defendant is accused of a murder which requires the mental states of intent to kill and malice, diminished capacity or unconsciousness due to voluntary intoxication may negate the element of malice, preventing a murder conviction. But voluntary intoxication cannot excuse such an intentional homicide. The defendant stands guilty of "nonstatutory" voluntary manslaughter, and the jury must be instructed on the manslaughter alternative where the evidence warrants. (See also *People* v. *Graham* (1969) 71 Cal.2d 303, 315-317, and fns. 2, 4 [78 Cal.Rptr. 217, 455 P.2d 153].)

concluded, under similar circumstances and without extended discussion, that "predictable conduct by a resisting victim" of a felony cannot "constitute the kind of provocation sufficient to reduce a murder charge to voluntary manslaughter. [Citation omitted.]" (*People* v. *Jackson* (1980) 28 Cal.3d 264, 306 [168 Cal.Rptr. 603, 618 P.2d 149] [plur. opn.; see conc. opn. of Newman, J., and dis. opn. of Mosk, J.], cert. den., 450 U.S. 1035 [68 L.Ed.2d 232, 101 S.Ct. 1750].)

Of course, neither "heat of passion" nor provocation can ever reduce a *murder properly based on the felony-murder doctrine* to voluntary manslaughter, and an instruction to that effect would be error. This is so because "malice," the mental state which otherwise distinguishes murder from voluntary manslaughter, is not an element of felony murder. The only mental state required for felony murder is that necessary for commission of the underlying felony. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697].)

Thus, there is a fundamental factual distinction between first degree felony murder on the one hand, and deliberate, premeditated murder on the other. The former "includes not only the latter, but also a variety of unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident; it embraces both calculated conduct *and acts committed in panic or rage,* or under the dominion of mental illness, drugs, or alcohol; and it condemns alike consequences that are highly probable, conceivably possible, or wholly unforeseeable." (*Id.,* at p. 477, italics added.)

Were we to recognize *on any theory* a "heat of passion manslaughter" defense based on resistance by a felony victim, an accidental killing in the course of a felony would be murder, while an intentional homicide in "panic or rage" at the victim's resistance would constitute a lesser offense. Such cannot be the law. We conclude there was no instructional error.

*5. Failure to instruct jury that felony-murder special circumstance requires specific intent to kill.*

Defendant's jury was instructed, among other things, that any killing, intentional or unintentional, in the commission of a robbery is first degree murder. (§§ 187, 189; *Dillon, supra,* 34 Cal.3d at pp. 475-477.) The jury found defendant guilty of first degree murder and also found true a single "special circumstance," that the murder occurred while defendant was engaged in the commission or attempted commission of a robbery. (§ 190.2, subd. (a)(17)(i).) On the basis of this special circumstance finding, defendant became eligible for one of only two penalties, death or life without parole.

In his opening and supplemental briefs, defendant has urged that the killing of Wanner was unintentional, and that the felony-murder doctrine cannot elevate an unintentional homicide to the capital offense of first degree murder with "special circumstances." To the extent defendant suggests that he cannot be *convicted* of first degree murder based solely on a homicide committed during a felony, we have resolved that issue against him. (*Dillon, supra,* 34 Cal.3d at pp. 476-477.) However, we have accepted the remainder of defendant's premise—that he cannot be sentenced under the capital provisions of the 1978 death penalty law for an unintentional killing.

In *Carlos, supra,* we ruled that a murderer cannot be confined to the punishments of death or life without parole unless he or she specifically intended to kill. Under the 1978 death penalty law, therefore, the jury must be instructed that it cannot find a "special circumstance" based solely on the commission of an underlying felony unless it also finds an intent to kill. (35 Cal.3d at pp. 152-154.) ▄▄ In *Garcia, supra,* the *Carlos* rule was made applicable to all cases still pending when *Carlos* was filed. (36 Cal.3d at p. 550.) ▄▄ We conclude that *Carlos* and *Garcia* compel reversal of the special circumstance finding and the judgment of death in this case.

As defendant notes, his jury was not instructed that a special circumstance finding of first degree murder in the course of a robbery requires an intent to kill. In *Garcia,* we held that this error requires reversal per se of a felony-murder special circumstance finding unless (1) defendant has conceded the issue of intent, (2) the issue was necessarily resolved against him under other, proper instructions (36 Cal.3d at pp. 555-556; see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds, *People* v. *Flannel, supra,* 25 Cal.3d 668 (the *Sedeno* exception)), or (3) "the parties recognized that intent to kill was in issue [and] presented all evidence at their command on that issue, and . . . the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration." (36 Cal.3d at p. 556; see *Thornton, supra,* 11 Cal.3d at pp. 768-769, fn. 20; *People* v. *Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256], disapproved on other grounds, *People* v. *Flannel, supra,* 25 Cal.3d 668 (the *Cantrell-Thornton* exception)).

Nothing in the trial record indicates that defendant conceded an intentional killing. It establishes at most an inference that defendant tailored his strategy on the assumption that the prosecution did not have to prove an intent to kill.

Moreover, neither the *Sedeno* nor the *Cantrell-Thornton* exception applies here. The jury was instructed on both premeditation and felony murder as

the basis for a first degree murder conviction, and the jury's verdict does not specify which theory it chose. Hence, there is no necessary inference that the jury found an intent to kill when it convicted defendant of murder. Indeed, the prosecutor stated several times in his closing argument that he was not claiming an intentional, premeditated murder, but was relying on the felony-murder doctrine, which required no intent to kill.

Nor does the evidence reveal an intent to kill as a matter of law. According to prosecution witnesses Hix and Henson, defendant said he fired his weapon accidentally, or in a panic response, when the victim attacked him with a hand tool. Henson testified that defendant repeatedly protested he did not mean to shoot Wanner. The position of the fatal wound corroborates this story. The wound, in the victim's thigh, was not in an area of vital organs, and the location suggests the gun went off before it was fully raised or aimed.

Hix and Henson both testified that defendant left Wanner at the isolated scene of the shooting despite the bleeding victim's pleas for help. However, even if it was apparent to defendant that the wound might be fatal unless he helped Wanner obtain treatment, a jury could reasonably conclude that defendant's behavior suggests only the "implied malice" arising from "an abandoned and malignant heart." (§ 188.) We have made clear that this form of "implied malice"—a base, antisocial indifference to the probability that one is causing death—does not satisfy the *Carlos* standard of intent to kill, which means the specific intent to take another's life. (*People* v. *Ramos* (1984) 37 Cal.3d 136, 148 [207 Cal.Rptr. 800, 689 P.2d 430], at fn. 3, cert. den. (1985) 471 U.S. 1119 [86 L.Ed.2d 266, 105 S.Ct. 2367].)

 Accordingly, we conclude that defendant is entitled to reversal of the special circumstance finding and the penalty judgment. Retrial of the robbery-murder special circumstance allegation must be before a jury properly instructed on the necessity of intent to kill.[25]

### 6. Multiple prosecution.

 Defendant points out that the underlying offense of first degree felony murder is punishable by 25 years to life, with possibility of parole. (See § 190.) However, by also charging a "special circumstance" that the murder occurred in the commission of the same underlying felony, the pros-

---

[25]Defendant suggests the prosecutor *conceded* at trial that the killing of Wanner was accidental. The record does not confirm this assertion. The most the prosecutor said in argument was that he was "not claiming" an intentional homicide. Now that both parties are aware of the importance of the intent issue, both must have the opportunity to introduce all evidence at their command on that issue.

ecution may subject the accused to a minimum penalty of life without possibility of parole. Defendant claims that, under statutory and constitutional principles against double jeopardy and multiple prosecution, conviction of the "lesser included offense" of first degree felony murder precludes further "prosecution" of the "greater offense" of first degree felony murder with a felony-murder special circumstance. (§ 654;[26] see U.S. Const., Amend. V, cl. 2; Cal. Const., art. I, § 15.)

This contention lacks merit. The laws governing first degree murder do not contemplate "multiple prosecution" under one statute for an act for which defendant has already been convicted under another. Rather, as the first clause of section 654 permits, they simply provide that an *intentional* first degree murder (*Carlos, supra,* 35 Cal.3d at pp. 152-154) with one or more special circumstances may be subject to the *punishment* of death.[27] When such a capital offense is alleged, the law provides that the first degree murder conviction must precede a determination whether a capital "special circumstance" exists. Defendant's effort to characterize this two-step procedure as "multiple prosecution" for the same act must fail.

## VI. PENALTY ISSUES

*1. Statutory vagueness as to "other crimes" which may be considered at penalty phase.*

Section 190.3 provides that, among other things, the jury, "[i]n determining the penalty, . . . shall take into account [as] relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true . . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the attempted use of force or violence or the express or implied threat to use force or violence. [and] [¶] (c) The presence or absence of any prior felony conviction. . . ." Defendant suggests that these "inconsistent and contradictory" provisions are void for vagueness, since, by first limiting consideration of "other crimes" to "violent" of-

---

[26]Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction under either one bars a prosecution for the same act or omission under any other."

[27]Indeed, section 190, part of the 1978 death penalty initiative, defines first degree murder as a *single offense* whose *punishment* shall be "death, confinement in the state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life," the penalty to be "determined as provided in" sections 190.1 through 190.5. These statutes clearly imply that *punishment* for the *single offense* of first degree murder depends on whether one or more statutory special circumstances are alleged and proved. If not, the 25-to-life penalty applies; if so, the death-or-life-without-parole penalties apply.

fenses, they suggest to the jury that *any* "prior felony conviction" introduced by the prosecution was for a violent crime.

The argument is specious. The plain meaning of subdivisions (b) and (c) of section 190.3 is that the jury must consider any *violent* criminal activity by the defendant, whether or not it led to prosecution and conviction,[28] *and* any "prior *felony conviction*" (italics added), whether the underlying offense was violent or nonviolent. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 774, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) A jury instructed in the statutory language (see CALJIC No. 8.84.1(b), (c)) could scarcely understand otherwise. The statute is not unconstitutionally vague.

*2. Use of "prior" felony convictions in aggravation.*

The trial court took judicial notice of defendant's convictions for the 1978 and 1980 auto thefts and placed them before the jury as "prior felony convictions" to be considered in aggravation. (§ 190.3, subd. (c).) Defendant contends that neither conviction was admissible for this purpose since neither, he claims, occurred prior to commission of the 1979 capital offense.

We find merit in defendant's contention that the "prior felony conviction[s]" described in subdivision (c) of section 190.3 are limited to those entered *before commission* of the capital crime. California courts have consistently so interpreted statutes which call for harsher penal treatment on the basis of "prior convictions." (E.g., *People* v. *McGee* (1934) 1 Cal.2d 611, 614 ["habitual criminal" enhancement]; *People* v. *Superior Court* (1930) 208 Cal. 688, 691 [284 P. 449] [eligibility for probation]; *In re Pfeiffer* (1968) 264 Cal.App.2d 470, 476 [70 Cal.Rptr. 831] [same]; *People* v. *Diaz* (1966) 245 Cal.App.2d 74, 77, and fn. 1, pp. 77-78 [53 Cal.Rptr. 666] [eligibility for narcotics addiction treatment deferral]; cf., *In re Calhoun* (1976) 17 Cal.3d 75, 81 [130 Cal.Rptr. 139, 549 P.2d 1235] [court's power to decide whether defendant with "prior existing conviction" shall serve terms concurrently or consecutively].) The presumed rationale of such laws is that an offender undeterred by his *prior brushes with the law* deserves more severe criminal treatment. (*Diaz, supra,* at fn. 1.)

We recognize the substantial argument that "prior convictions" play a different role under section 190.3. Subdivision (c) *mandates* no increased punishment on the basis of "prior" convictions. One could argue, as does Justice Lucas in dissent, that the subdivision seeks only to increase the reliability of the sentencing determination by giving the jury a fuller picture

[28]The statute bars introduction of evidence of any crime of which defendant was *acquitted*.

of the defendant's general propensity for criminality. That picture would be incomplete if nonviolent convictions incurred after commission of the capital offense were excluded.

Indeed, subdivision *(b)* imposes *no* time limitation on the introduction of "violent" crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life. Therefore, one might conclude, subdivision (c)'s "conviction" requirement is no more than a policy judgment that "nonviolent felonies are entitled to some weight [in the penalty determination], but only if *evidenced* by a conviction—otherwise the time and trouble of *proving* the crime will outweigh its probative value. . . ." (*Boyd, supra,* 38 Cal.3d at p. 774, italics added.)

We agree that subdivision (c) intends convictions to be the sole quick and reliable way of proving marginally relevant nonviolent felonies. But we doubt that is its sole intent.

Had the initiative's drafters intended subdivision (c) as but a limitation on the *method of proof* of nonviolent felonies, it could simply have used the phrase "any other felony convictions." The word "prior" is redundant in that context, since, logically, no other felony "conviction" would be available for introduction at the capital penalty trial unless it had already been entered. Yet, in sharp contrast with subdivision (b), the drafters inserted the word "prior." We submit that this distinct word in subdivision (c) can have only one meaning—that a nonviolent conviction is admissible only if it was entered before commission of the capital offense.

Given the limited importance of nonviolent criminality to a death penalty determination, it seems plausible to assume the initiative's drafters intended the use of nonviolent convictions only for their most material purpose—to demonstrate that the *capital offense* was undeterred by *prior successful felony prosecutions.* We therefore conclude that subdivisions (b) and (c) of section 190.3 have separate purposes. Subdivision (b) allows in *all* evidence of *violent* criminality to show defendant's propensity for violence. Subdivision (c) allows in "prior" nonviolent felony "convictions" to show that the capital offense was the *culmination* of *habitual criminality*—that it was undeterred by the community's previous criminal sanctions.[29]

---

[29]As noted, section 190.3 allows all evidence of violent crime to be introduced in evidence and considered as an aggravating factor at the penalty phase, but it expressly *forbids* introduction of evidence of nonviolent crimes except where they resulted in felony convictions. This careful distinction between "other crimes" evidence which is admissible and relevant and that which is not refutes Justice Lucas's contention that the statutory purpose is to place all conceivably relevant "bad character" evidence before the penalty jury.

Accordingly, we determine that subdivision (c)'s reference to "prior" convictions is limited, in line with the long-standing California rule, to convictions entered before the capital crime was committed. Hence, at any penalty retrial, defendant's conviction for the 1980 auto theft should not be admitted, since it occurred after the December 1979 slaying of Wanner.

■ We do not, however, accept defendant's suggestion that the conviction for the 1978 auto theft is also inadmissible on this basis. Defendant was prosecuted in 1978 for violation of Vehicle Code section 10851, which is punishable either as a felony or as a misdemeanor. He notes that he entered a guilty plea in *municipal* court, which has no felony jurisdiction, and was placed on probation without imposition of sentence. (See § 1203.) Hence, he reasons, a "felony conviction" occurred only when, in 1980, the superior court revoked probation and sentenced defendant to state prison.

The contention lacks merit. The complaint charged a felony, and, on July 11, 1978, defendant pled guilty to felony auto theft before a magistrate. A magistrate may take a felony guilty plea, after which the case proceeds in superior court as if the plea had occurred there. (§ 859a.)

At a sentencing hearing on August 8, 1978, the superior court withheld sentence and granted probation. But use of this procedure did not prevent the case from constituting a "prior conviction" as of that time. (See § 1203.4.) For purposes of a "prior conviction" statute, defendant suffers such a conviction when he pleads guilty. (E.g., *People* v. *Banks* (1959) 53 Cal.2d 370, 390-391 [1 Cal.Rptr. 669, 348 P.2d 102]; see also *Stephens* v. *Toomey* (1959) 51 Cal.2d 864, 869 [338 P.2d 182].) And a felony-misdemeanor offense is deemed a felony for all purposes with specific exceptions not relevant here. (§ 17; see, e.g., *Banks, supra,* 53 Cal.2d at pp. 381-382, 385, fn. 8; *People* v. *Bozigian* (1969) 270 Cal.App.2d 373, 379 [75 Cal.Rptr. 876].)[30] ■■ ■■■ The 1978 auto theft thus produced a "prior felony conviction" admissible under section 190.3, subdivision (c).[31]

---

[30]Under section 17, the offense is a misdemeanor after (1) a "judgment" is entered which imposes a "punishment other than" state prison; (2) the court designates the offense a misdemeanor when granting probation without imposition of sentence, or when committing defendant to the Youth Authority, or on application for such a declaration; (3) the offense is charged as a misdemeanor without defendant's objection; (4) the committing magistrate declares the offense a misdemeanor; or (5) defendant is discharged from his Youth Authority commitment.

[31]Defendant argues that the "multiple prosecution" proscription of section 654 was violated because he was convicted and sentenced for the 1978 auto theft, and the theft was also used to revoke his probation in the 1980 case and in a 1979 misdemeanor drunk-driving matter. But use of subsequent criminal conduct to revoke probation only results in imposition of punishment for the *earlier crimes* of which defendant has *already been convicted.* Section

### 3. Use of uncharged "other crimes" at penalty phase.

 Defendant argues that the 1978 law denies due process insofar as it permits a jury which has already decided defendant's guilt to consider, on the issue of penalty, other violent crimes on which defendant was neither charged nor convicted. (§ 190.3, subd. (b).) Such a penalty jury, defendant contends, is prejudiced by its prior view of defendant's serious criminality. Moreover, he suggests, use of uncharged crimes as an aggravating factor allows imposition of the death penalty for unconvicted offenses which were deemed unworthy of prosecution.

We cannot agree. Even if a separate jury were empaneled to decide the penalty, it would be entitled to hear, in aggravation or mitigation, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding," including "the existence of any special circumstance found true" at the guilt trial. (§ 190.3, subd. (a).) Under these circumstances, the strong legislative preference for a unitary jury outweighs any "supposed disadvantage" to defendant in the single-jury process. (See § 190.4, subd. (c); *Thornton, supra,* 11 Cal.3d at p. 753; cf., *Fields, supra,* 35 Cal.3d at pp. 351-352.)

If accepted, of course, the same-jury argument would logically extend to *all* factual disputes at the penalty phase, and to all efforts to try more than one crime to the same jury. As the line of cases applying the "reasonable doubt" standard to evidence of "other crimes" demonstrates (see, e.g., *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Tahl* (1967) 65 Cal.2d 719, 736-738 [56 Cal.Rptr. 318, 423 P.2d 246], cert. den., 389 U.S. 942 [19 L.Ed.2d 294, 88 S.Ct. 301]), it has long been assumed that due process does not preclude the consideration of this type of evidence by a penalty jury which has found the defendant guilty of murder.

At least two other jurisdictions have concluded that due process precludes a "guilt" jury from hearing "other crimes" evidence at the penalty phase. (*State* v. *Bartholomew* (1982) 98 Wn.2d 173 [654 P.2d 1170, 1184]; *State* v. *McCormick* (Ind. 1979) 397 N.E.2d 276, 279-281.) However, we find nothing in recent United States Supreme Court decisions to support such a conclusion. The court has often declared that states have the broadest possible range in deciding what negative aspects of the defendant's character and background are relevant to the sentencing determination. (E.g.,

654 does not prohibit such "multiple use" of a subsequent criminal incident. Nor is section 654 violated by use of a prior crime on which defendant has been sentenced as an aggravating factor at a capital penalty trial. Any such rule would invalidate all statutory "habitual criminal" enhancements.

*Estelle* v. *Smith* (1981) 451 U.S. 454, 472-473 [68 L.Ed.2d 359, 375-376, 101 S.Ct. 1866]; *Jurek* v. *Texas* (1976) 428 U.S. 262, 276 [49 L.Ed.2d 929, 941, 96 S.Ct. 2950] [pl. opn.], rehg. den., 429 U.S. 875 [50 L.Ed.2d 158, 97 S.Ct. 198]; *Gregg* v. *Georgia* (1976) 428 U.S. 153, 203-204 [49 L.Ed.2d 859, 891-892, 96 S.Ct. 2909] [pl. opn.], rehg. den., 429 U.S. 875 [50 L.Ed.2d 158, 97 S.Ct. 197, 97 S.Ct. 198]; see also *California* v. *Ramos* (1983) 463 U.S. 992, 1009 and fn. 23; [77 L.Ed.2d 1171, 1186, 103 S.Ct. 3446], *Zant* v. *Stephens* (1983) 462 U.S. 862, 886-887 [77 L.Ed.2d 235, 255-255, 103 S.Ct. 2733].) ▮▮▮ It has never suggested that this penalty evidence must be heard by a separate jury.

▮▮▮ As is therefore apparent, we must also reject defendant's argument that other crimes are inadmissible per se in a penalty trial. Contrary to defendant's suggestion, admission of evidence of uncharged criminal violence does not impose the death penalty for a noncapital offense of which defendant was never convicted. Rather, the evidence of criminality, if proved beyond a reasonable doubt (*Robertson, supra,* 33 Cal.3d at pp. 53-55), is simply one factor the penalty jury is to consider in deciding the appropriate punishment for the capital offense.[32]

### 4. *Other penalty phase issues.*

Defendant raises a number of other challenges to the penalty phase of his trial. We deem it unnecessary to address them here.

### VII. CONCLUSION

The judgment of guilt is upheld as to all counts. The single special circumstance finding—that defendant committed a first degree murder while

---

[32]The Washington Supreme Court's judgment in *Bartholomew, supra,* was vacated on certiorari to the United States Supreme Court, and the case was remanded for reconsideration in light of *Zant, supra.* (*Washington* v. *Bartholomew* (1984) 463 U.S. 1203 [77 L.Ed.2d 1383, 103 S.Ct. 3530].) In a subsequent opinion (*State* v. *Bartholomew* (1984) 101 Wn.2d 631 [683 P.2d 1079]), the state court again concluded, on both state and federal grounds, that Washington's death penalty statute is invalid insofar as it permits evidence at the penalty phase of prior criminal activity for which defendant had not been convicted. The court noted that both *Zant* and *Ramos* had quoted with approval a passage from *Gregg* which suggested a bar on sentence-phase evidence which would "prejudice" the defendant. (*Gregg, supra,* 428 U.S. at pp. 203-204 [49 L.Ed.2d at pp. 891-892]; see *Ramos, supra,* 463 U.S. at pp. 1009-1010, fn. 23 [77 L.Ed.2d at p. 1186]; *Zant, supra,* 462 U.S. at pp. 886-887 [77 L.Ed.2d at pp. 255-256].) It also cited *Gardner* v. *Florida* (1977) 430 U.S. 349 [51 L.Ed.2d 393, 97 S.Ct. 1197], for the proposition that evidence weighing in favor of death must be extremely reliable. (See pp. 358-359 [51 L.Ed.2d at p. 402].) As before, we are not persuaded by the Washington court's conclusion that evidence of prior uncharged crimes at the penalty phase is "prejudicial," "unreliable," "irrelevant," or "fundamentally unfair." The penalty phase is unique, intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair.

engaged in a robbery—is set aside. Accordingly, the judgment of death is reversed and the cause remanded to the trial court for further proceedings.

Broussard, J., Reynoso, J., and Kaus, J.,* concurred.

**LUCAS, J.,** Concurring and Dissenting.—I concur in the judgment to the extent it affirms defendant's conviction of guilt as to all counts.

I dissent, however, to that portion of the majority opinion which holds that the trial court in a criminal case must permit "reasonable inquiry" regarding prospective jurors' "specific legal prejudices" which might be used as a basis for a challenge for cause. (*Ante,* p. 185.) In other words, in addition to determining the venireman's general ability to follow the law and the judge's instructions, counsel must now be permitted to explore the juror's reactions to any legal doctrines which are "material to the trial and controversial." (*Ante,* p. 184.) Apart from the obvious difficulty a trial court will have in determining whether a particular legal doctrine is "controversial" (the majority finds the diminished capacity doctrine meets that standard, while the circumstantial evidence rule does not), the majority's holding will cause further delay in a voir dire process already overencumbered by unrealistic restrictions upon the trial court's ability to expedite and control the proceedings. (See *People* v. *Williams* (1981) 29 Cal.3d 392, 407-409 [174 Cal.Rptr. 317, 628 P.2d 869] [allowing voir dire exploration of possible peremptory challenges].)

In 1973, our court observed that "*voir dire,* designed as a device to weed out unsuitable jurors, may, if over-extended by counsel, be self-destructive. If *voir dire* is burdened with the weight of excess rococo examination, the trial structure itself can be endangered." (*People* v. *Crowe* (1973) 8 Cal.3d 815, 819 [106 Cal.Rptr. 369, 506 P.2d 193].) Quoting from an earlier case, we noted in *Crowe* "'an increasing tendency to prolong the proceedings *inordinately* by allowing counsel on either side to indulge in tedious examination of jurors, apparently with no definite purpose or object in view, but with the hope of eliciting something indicating the advisability of a peremptory challenge . . . .'" (*Id.,* at p. 821.) We further decried voir dire attempts by counsel "'to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.'" (P. 824, fn. omitted.)

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

In *Crowe,* we found no error, and no statutory or constitutional inhibition, in a procedure whereby the trial judge conducted the *entire* voir dire examination himself, permitting counsel to submit questions which, if reasonable, would be propounded by the judge. Approving this practice, we concluded in *Crowe* that "direct examination by counsel has perverted the purpose of *voir dire,* and transformed the examination of jurors into a contest between counsel for the selection of a jury partial to his cause and for the attainment of rapport with the jurors so selected, a contest which may overshadow the actual trial on the merits." (P. 828, fn. omitted.) Although *Crowe*'s immediate holding was abrogated by an amendment to Penal Code section 1078, permitting direct examination by counsel, *Crowe*'s insights and concerns remain as valid and compelling today as when written 13 years ago. The majority, in cases such as *People* v. *Williams, supra,* 29 Cal.3d 392, and the present case, has ignored those teachings and has given counsel broad leeway to conduct protracted fishing expeditions ostensibly aimed at developing challenges to particular jurors, but equally susceptible to the various abuses catalogued in *Crowe.* I cannot join my colleagues in their continued departure from *Crowe*'s admonition against unduly overextending the voir dire process. The costs to the judicial process are simply too great.

I also dissent to that portion of the judgment which sets aside the special circumstances finding and reverses the penalty of death by reason of *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. For reasons previously expressed, I strongly disagree with the holdings in those cases. (See *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [205 Cal.Rptr. 810, 685 P.2d 1161] (dis. opn.).) But assuming arguendo that those cases were correctly decided, I fully concur with the majority opinion that there was sufficient evidence of intent to kill to permit retrying defendant on a felony-murder special circumstance theory.

Finally, I dissent to that portion of the majority opinion which directs the trial court, on retrial of the penalty phase, to exclude evidence of defendant's 1980 felony auto theft conviction. The majority reasons that the conviction is inadmissible because it did not occur prior to defendant's commission of the 1979 capital offense, and accordingly, was not a "prior conviction" within the meaning of the 1978 death penalty law. (Pen. Code, § 190.3, subd. (c).) This holding, which would withhold from the penalty jury vital information regarding defendant's character and criminal record, is patently wrong.

The initial paragraph of section 190.3 states that at the penalty trial "evidence may be presented by both the people and the defendant as to *any matter relevant to aggravation,* mitigation, *and sentence* including, but not

limited to, the nature and circumstance of the present offense, *any prior felony conviction or convictions* whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of . . . [or express or implied threat to use] force or violence, *and the defendant's character, background, history,* mental condition and physical condition." (Italics added.)

The section continues by setting forth the specific sentencing factors which the trier of fact must take into account, including "The presence or absence of any prior felony conviction." (Subd. (c).) The obvious purpose of section 190.3, when read in its entirety, is to permit the jury to consider *all* relevant facts and circumstances which might aid the trier of fact in making an intelligent, nonarbitrary penalty decision. How can it possibly be argued that the defendant's felony convictions, even those occurring subsequent to his capital offense, are irrelevant or improper factors for the trier of fact's consideration? In the words of the United States Supreme Court, "consideration of the character *and record* of the individual offender" is a "constitutionally indispensible part" of the death penalty determination process. (*Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978], italics added.) Thus, any felony conviction which the defendant has suffered *prior to capital sentencing* is highly relevant to the penalty determination and is clearly admissible under section 190.3.

In my view, to deprive the trier of fact of relevant information regarding defendant's background defeats the overriding statutory purpose of assuring that the penalty in capital cases is carefully tailored to both the offense and the offender. Why should one who suffered, for example, a plethora of felony convictions *following commission of his murder* be treated identically, for capital sentencing purposes, to the offender who led a blameless life following such an offense? And what of the offender who is convicted of attempting to escape from jail or prison (Pen. Code, §§ 4530, subd. (b), 4532, subd. (b)) *following* his incarceration for a capital offense? Should not the penalty jury be told of that defendant's demonstrated refusal to peacefully accept his punishment?

I would affirm the judgment in its entirety.

**MOSK, J.**—I concur in the judgment of guilt but dissent from setting aside the special circumstance finding and the penalty.

The evidence is sufficient to show an intent to kill within the requirements of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. The majority stress the accidental nature of the original shooting.

That may be so, though it is debatable. But the original shooting was not the ultimate cause of death: it was the deliberate, intentional abandonment by defendant of his mortally wounded victim with knowledge that death was the inevitable result.

The majority describe the foregoing conduct as demonstrating "implied malice" and thus the basis merely for a second degree murder verdict. I find the admitted conduct, in light of all the deliberate criminal activity preceding it, demonstrates the specific intent that another's life is to be forfeited. The defendant's intentional purpose was clear, both from his declarations and his actions: to prevent the bleeding victim from reaching a place of safety from which he could eventually identify defendant and cause him to be prosecuted.

While it is true in this pre-*Carlos* case the prosecutor argued to the jury that intent to kill was immaterial, the issue of intent was litigated pro and con through experts, as part of a diminished capacity defense. The purpose of urging defendant's diminished capacity was to convince the jury that he could not form the required intent to kill.

Since I have pen in hand, I add a comment on the separate opinion of Justice Lucas. One can understand his affinity for the federal system, in which the trial judge conducts most if not all of the voir dire examination of prospective jurors. He appears to look with nostalgia on *People* v. *Crowe* (1973) 8 Cal.3d 815 [106 Cal.Rptr. 369, 506 P.2d 193], in which Justice Tobriner and a majority approved that practice for California. I dissented in *Crowe*. Within a year the Legislature acted to repudiate the *Crowe* majority by amending Penal Code section 1078 to assure once again the right of counsel to conduct voir dire examination. Thus the quarrel of Justice Lucas on policy is essentially with the Legislature. Whenever abuses of juror inquiry occur, *People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869], provides adequate control in the trial judge to prevent incursions into irrelevancy.

On the issue at hand, I find that the errors, if any, urged by defendant are harmless within the proscription of California Constitution, article VI, section 13.

I would affirm the judgment in its entirety.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the setting aside of the special circumstance finding and the reversal of the penalty judgment for *Carlos-Garcia* error. (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]; *People* v. *Garcia* (1984) 36 Cal.3d 539

[205 Cal.Rptr. 265, 684 P.2d 826].) I do not join in the remainder of the majority's opinion.

On March 27, 1986, the opinions were modified to read as printed above.